Janice PAUL, a/k/a/ Janice Perez,
Plaintiff-Appellant,

v.

**WATCHTOWER BIBLE AND TRACT SOCIETY OF NEW YORK, INC.,**
Defendants-Appellee.

No. 85–4012.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 7, 1986.

Decided June 10, 1987.

Robert A. Castrodale, Coulee, Wash., for the plaintiff/appellant.

Gregory J. Arpin, Spokane, Wash., for the defendant/appellee.

Before WRIGHT, TANG and REINHARDT, Circuit Judges.

REINHARDT, Circuit Judge:

Janice Paul, a former member of the Jehovah's Witness Church, appeals from the grant of summary judgment in favor of defendants, the corporate arms of the Governing Body of Jehovah's Witnesses. Paul contends that she is being "shunned" by adherents of the Jehovah's Witness faith. She initially filed suit in state court, setting forth various tort claims. Defendants removed the action on the ground of diversity. Because the practice of shunning is a part of the faith of the Jehovah's Witness, we find that the "free exercise" provision of the United States Constitution and thus of the Washington State Constitution precludes the plaintiff from prevailing. The defendants have a constitutionally protected privilege to engage in the practice of shunning. Accordingly, we affirm the grant of summary judgment, although for reasons different from those of the district court. See generally Anderson v. Liberty Lobby, Inc., —— U.S. ——, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## I. Facts

Janice Paul was raised as a Jehovah's Witness. Her mother was very active in the Church and, from the age of four, Paul attended church meetings. In 1962, when Paul was 11 years old, her mother married the overseer of the Ephrata, Washington congregation of Jehovah's Witnesses. In 1967, Paul officially joined the Witnesses and was baptized.

According to Paul, she was an active member of the congregation, devoting an average of 40 hours per month in door-to-door distribution of the Witnesses' publications. In addition to engaging in evening home bible study, she attended church with her family approximately 20 hours per month. She eventually married another member of the Jehovah's Witnesses.

In 1975, Paul's parents were "disfellowshiped" from the Church. According to Paul, her parents' expulsion resulted from internal discord within their congregation. The Elders of the Lower Valley Congregation told Paul that she and her husband should not discuss with other members their feeling that her parents had been unjustly disfellowshiped. That advice was underscored by the potential sanction of her own disfellowship were she to challenge the decision.

Sometime after the Elders' warning, Paul decided that she no longer wished to belong to the congregation, or to remain affiliated with the Jehovah's Witnesses. In November 1975, Paul wrote a letter to the congregation withdrawing from the Church.

The Witnesses are a very close community and have developed an elaborate set of rules governing membership. The Church has four basic categories of membership, non-membership or former membership status; they are: members, non-members, disfellowshiped persons, and disassociated persons. "Disfellowshiped persons" are former members who have been excommunicated from the Church. One consequence of disfellowship is "shunning," a form of ostracism. Members of the Jehovah's Witness community are prohibited— under threat of their own disfellowship— from having any contact with disfellowshiped persons and may not even greet them. Family members who do not live in the same house may conduct necessary family business with disfellowshiped relatives but may not communicate with them

on any other subject. Shunning purportedly has its roots in early Christianity and various religious groups in our country engage in the practice including the Amish, the Mennonites, and, of course, the Jehovah's Witnesses.

"Disassociated persons" are former members who have voluntarily left the Jehovah's Witness faith. At the time Paul disassociated, there was no express sanction for withdrawing from membership. In fact, because of the close nature of many Jehovah's Witness communities, disassociated persons were still consulted in secular matters, e.g. legal or business advice, although they were no longer members of the Church. In Paul's case, for example, after having moved from the area, she returned for a visit in 1980, saw Church members and was warmly greeted.

In September 1981, the Governing Body of Jehovah's Witnesses, acting through the defendants—Watchtower Bible and Tract Society of Pennsylvania, Inc., and the Watchtower Bible and Tract Society of New York, Inc.—issued a new interpretation of the rules governing disassociated persons. The distinction between disfellowshiped and disassociated persons was, for all practical purposes, abolished and disassociated persons were to be treated in the same manner as the disfellowshiped. The September 15, 1981 issue of *The Watchtower*, an official publication of the Church, contained an article entitled "Disfellowshiping—how to view it." The article included the following discussion:

THOSE WHO DISASSOCIATE THEM-SELVES

... Persons who make themselves 'not of our sort' by deliberately rejecting the faith and beliefs of Jehovah's Witnesses should appropriately be viewed and treated as are those who have been disfellowshiped for wrongdoing.

*The Watchtower* article based its announcement on a reading of various passages of the Bible, including 1 John 2:19 and Revelations 19:17–21. The article noted further that "[a]s distinct from some personal 'enemy' or worldly man in authority who opposed Christians, a ... disassociated person who is trying to promote or justify his apostate thinking or is continuing in his ungodly conduct is certainly not one to whom to wish 'Peace' [understood as a greeting]. (1 Tim. 2:1, 2)." Finally, the article stated that if "a Christian were to throw in his lot with a wrongdoer who ... has disassociated himself, ... the Elders ... would admonish him and, if necessary, 'reprove him with severity.' " (citing, *inter alia*, Matt. 18:18, Gal. 6:1, Titus 1:13).

Three years after this announcement in *The Watchtower*, Paul visited her parents, who at that time lived in Soap Lake, Washington. There, she approached a Witness who had been a close childhood friend and was told by this person: "I can't speak to you. You are disfellowshiped." Similarly, in August 1984, Paul returned to the area of her former congregation. She tried to call on some of her friends. These people told Paul that she was to be treated as if she had been disfellowshiped and that they could not speak with her. At one point, she attempted to attend a Tupperware party at the home of a Witness. Paul was informed by the Church members present that the Elders had instructed them not to speak with her.

Upset by her shunning by her former friends and co-religionists, Paul, a resident of Alaska, brought suit in Washington State Superior Court alleging common law torts of defamation, invasion of privacy, fraud, and outrageous conduct. Defendants, Watchtower Bible and Tract Associations, removed the action to federal court pursuant to 28 U.S.C. § 1441 (1982). Watchtower moved to dismiss for lack of subject matter jurisdiction and for failure to state a claim under Washington law. Fed.R.Civ.P. 12(b)(1) & (6). In the alternative, Watchtower sought summary judgment. Fed.R.Civ.P. 56(b).

■ The district court denied the 12(b)(1) motion to dismiss for lack of subject matter jurisdiction and the 12(b)(6) motion to dismiss for failure to state a claim, but granted the motion for summary judgment. The court ruled that it had jurisdiction over the case because the state court properly had jurisdiction originally. *See*

*Salveson v. Western States Bankcard Ass'n,* 731 F.2d 1423, 1431 (9th Cir.1984). The court also held that Paul's affidavits did not set forth facts that would establish a prima facie case for relief. Moreover, the court ruled that even if the practice of shunning was actionable, the court was prohibited from ruling on the issue on the ground of ecclesiastical abstention. That doctrine prohibits courts from determining issues of canon law. *See generally Serbian Eastern Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976).[1]

## II. The Plaintiff's Cause of Action

Janice Paul seeks relief against the Church and several Church officials under Washington state law and pleads various causes of action in tort. She claims in essence that the practice of shunning invades interests that the state does or should protect through its tort law.

The case is properly before the federal courts because of our diversity jurisdiction. *See* 28 U.S.C. §§ 1332 & 1447. When federal courts sit in diversity, we apply state law. *Erie R.R. v. Thompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Our task is complicated by the fact that there are no Washington cases considering whether a cause of action in tort exists against a church for "shunning" a former member or for engaging in comparable religious practices, although the applicability of state tort law to church practices has been the subject of recent litigation in other jurisdictions. *See Annotation, Liability of Religious Association for Damages for Intentionally Tortious Conduct in Recruitment, Indoctrination, or Related Activity,* 40 ALR 4th 1062 (1985); *Miller v. Catholic Diocese of Great Falls,* 728 P.2d 794 (Mont.1986).

■ We note at the outset that in this case the actions of Church officials and members were clearly taken pursuant to Church policy. *Cf. Van Schaick v. Church of Scientology of California,* 535 F.Supp. 1125, 1142 (D.Mass.1982) (noting plaintiff's "burden to show that the actions taken against her by individual church members were taken pursuant to some Church policy, practice or directive"). Although shunning is intentional, the activity is not malum in se. The state is legitimately concerned with its regulation only to the extent that individuals are directly harmed.

One state has recently recognized a cause of action in tort arising from the practice of shunning. Although it did not purport to create a new tort, the Supreme Court of Pennsylvania, in *Bear v. Reformed Mennonite Church,* 462 Pa. 330, 341 A.2d 105 (1975), noted that certain interests protected by the state may be invaded when shunning occurs. As the Court stated:

the "shunning" practice of appellee church and the conduct of the individuals

---

1. The doctrine of ecclesiastical abstention is not pertinent here. As Justice Brennan noted for the Court in *Serbian Orthodox Diocese:*

    [W]here resolution of the disputes cannot be made without extensive inquiry by civil courts into religious law and polity, the First and Fourteenth Amendments mandate that civil courts shall not disturb the decisions of the highest ecclesiastical tribunal within a church of hierarchical polity, but must accept such decisions as binding on them, in their application to the religious issues of doctrine or polity before them.

    426 U.S. at 709, 96 S.Ct. at 2380. Ecclesiastical abstention thus provides that civil courts may not redetermine the correctness of an interpretation of canonical text or some decision relating to government of the religious polity. Rather, we must accept as a given whatever the entity decides. *See id.* at 710, 96 S.Ct. at 2381 (Courts "must accept such decisions as final,

    and as binding on [us], in their application to the case before [us].") (quoting *Watson v. Jones,* 80 U.S. (13 Wall.) 679, 727, 20 L.Ed. 666 (1872)). *Cf. United States v. Ballard,* 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944) (courts will not inquire as to the truth or sincerity of religious beliefs).

    This limited abstention doctrine is not relevant here because Paul is not alleging that the new rules governing disassociation are improper under Church law. (Paul has dropped her fraud claim, *cf. id.* at 713, 96 S.Ct. at 2382.) Nor does she seek relief for having been "wrongfully" disfellowshiped. Rather, she seeks relief for the harms she has suffered as a result of conduct engaged in by the Jehovah's Witnesses that is presumably consistent with the governing law of the Church. Accordingly, the doctrine of *Serbian Orthodox Diocese* does not apply.

may be an excessive interference within areas of "paramount state concern," i.e. the maintenance of marriage and family relationship, alienation of affection, and the tortious interference with a business relationship....

*Id.* at 107.

Under Washington tort law there are at least three basic categories of intentional conduct that are relevant here: conduct causing emotional distress, conduct causing alienation of affections, and conduct causing harm to reputation. Paul claims to have suffered injuries in all three categories as a result of the intentional actions of the Jehovah's Witnesses. Under Washington law, "intangible-emotional" harm is, at least in some circumstances, sufficient to support a claim in tort. *See Wilson v. Lund*, 80 Wash.2d 91, 98, 491 P.2d 1287, 1291 (1971) (" *'intangible-emotional' injuries can and do constitute real and significant harms* ") (emphasis in original) (permitting damages for loss of love and companionship of dead child and for injury to or destruction of parent-child relationship); *cf. Baugh v. Thomas*, 56 N.J. 203, 265 A.2d 675, 677 (N.J.1970) ("We believe that expulsion from a church or other religious organization can constitute a serious emotional deprivation which, when compared to some losses of property or contract rights, can be far more damaging to an individual.").

■ Federal courts are not precluded from affording relief simply because neither the state Supreme Court nor the state legislature has enunciated a clear rule governing a particular type of controversy. Were we able to invoke only clearly established state law, litigants seeking to protect their rights in federal courts by availing themselves of our diversity jurisdiction would face an inhospitable forum for claims not identical to those resolved in prior cases. Equally important, a policy by the federal courts never to advance beyond existing state court precedent would vest in defendants the power to bar the successful adjudication of plaintiffs' claims in cases with novel issues; defendants could ensure

a decision in their favor simply by removing the case to federal court. Congress, in providing for removal, certainly did not intend to provide such a weapon to defendants.

■ Nonetheless, we need not decide here whether Washington courts would ultimately rule that Paul has set forth a prima facie claim for relief in tort because the defendants, in any event, possess an affirmative defense of privilege—a defense that permits them to engage in the practice of shunning pursuant to their religious beliefs without incurring tort liability. Were shunning considered to be tortious conduct, the guarantee of the free exercise of religion would provide that it is, nonetheless, privileged conduct. In theory, we could examine the question whether the shunning of a former member of a church is, in itself, tortious; however, we will follow the practice of Washington courts which safeguard the free exercise of religion through the recognition of substantive defenses to torts, rather than by negating the plaintiff's cause of action itself (i.e. ruling that the conduct in question is not tortious). *See Carrieri v. Bush*, 69 Wash.2d 536, 419 P.2d 132, 137 (1966). The Washington practice, in addition to being the governing rule here is, in our view, the most sensible juridical approach. *See New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

### III. The Defendants' Privilege

Shunning is a practice engaged in by Jehovah's Witnesses pursuant to their interpretation of canonical text, and we are not free to reinterpret that text.[2] Under both the United States and Washington Constitutions, the defendants are entitled to the free exercise of their religious beliefs. As the Washington Supreme Court has stated, "[t]here is no question that our state constitution protects the free exercise of religious beliefs (Const. art. 1, § 11 (amendment 34))." *Carrieri v. Bush*, 69 Wash.2d 536, 419 P.2d 132, 137 (1966).

---

**2.** *See supra* note 1.

The free exercise protections of the Washington Constitution are at least as generous as those of the federal constitution. Indeed, in a decision rendered last year, the Washington Supreme Court relied exclusively on federal precedent in interpreting the scope of the free exercise protections of its constitution, noting that the "parties have not argued persuasively for a different application of the provisions of the First Amendment and Const. art. 1, § 11 (amend. 34) of the State Constitution as they pertain to the [free] exercise of religion." *Backlund v. Board of Comm'rs of King County Hosp.*, 106 Wash.2d 632, 639 n. 3, 724 P.2d 981, 985 n. 3 (1986). The parties here also do not suggest any dissimilarity between the free exercise provisions of the two constitutions. Accordingly, we too will assume that they are identical and will base our conclusion as to the meaning of the Washington Constitutional provisions on our understanding of the parallel provision of the First Amendment. *Cf. Examining Bd. of Eng'rs v. Flores de Otero*, 426 U.S. 572, 597–98, 96 S.Ct. 2264, 2278–79, 49 L.Ed.2d 65 (1976).[3]

■ State laws whether statutory or common law, including tort rules, constitute state action. In *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court ruled that state libel laws are subject to the constraints of the first amendment. "The test," according to the Court, "is not the form in which state power has been applied but, whatever the form, whether such power has in fact been exercised." 376 U.S. at 265, 84 S.Ct. at 718. *See also Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 936–40, 102 S.Ct. 2744, 2753–55, 73 L.Ed.2d 482 (1982); *Shelley v. Kraemer*, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948); *American Fed'n of Labor v. Swing*, 312 U.S. 321, 61 S.Ct. 568, 85 L.Ed. 855 (1941). For purposes of this test, we see no difference between libel and other forms of torts. Clearly, the application of tort law to activities of a church or its adherents in their furtherance of their religious belief is an exercise of state power. When the imposition of liability would result in the abridgement of the right to free exercise of religious beliefs, recovery in tort is barred.

The Jehovah's Witnesses argue that their right to exercise their religion freely entitles them to engage in the practice of shunning. The Church further claims that assessing damages against them for engaging in that practice would directly burden that right.

We agree that the imposition of tort damages on the Jehovah's Witnesses for engaging in the religious practice of shunning would constitute a direct burden on religion. The free exercise claim here is unlike the one in *Braunfeld v. Brown*, 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563

---

**3.** We note that some Washington state constitutional protections are more strict than their federal counterparts. For example, Washington applies a much more stringent standard in determining whether a state regulation violates the state's "establishment clause." *See Witters v. State Comm'n for the Blind*, 102 Wash.2d 624, 689 P.2d 53, 55 (1984) ("our state constitution requires a far stricter separation of church and state than the federal constitution); *cf. Bering v. SHARE*, 106 Wash.2d 212, 721 P.2d 918, 931 (1986) (requiring higher standard to justify state restriction of time, place, and manner restrictions on free speech). As we note in the text, the parties here have not argued for a stricter interpretation of the scope of the state protections of the free exercise of religion. *See, e.g., Sumner v. First Baptist Church*, 97 Wash.2d 1, 639 P.2d 1358 (1982); *Bolling v. Superior Court*, 16 Wash.2d 373, 133 P.2d 803 (1943) (ruling after *Minersville School Dist. v. Gobitis*, 310 U.S. 586,

60 S.Ct. 1010, 84 L.Ed. 1375 (1940) but before *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), that the free exercise protections of the Washington Constitution preclude conditioning attendance at public school on flag salutation).

States are, of course, free to interpret the provisions of their constitutions as being more protective of individual rights than are the comparable provisions of the federal constitution. The California Supreme Court has done so for a number of years. *See, e.g., Serrano v. Priest*, 5 Cal.3d 584, 487 P.2d 1241, 96 Cal.Rptr. 601, 41 ALR 3d 1187 (Cal.1971). Most recently, the Oregon Supreme Court held that all speech is protected under the state constitution including speech that would be considered obscene for purposes of the first amendment of the United States Constitution. *State v. Henry*, 302 Or. 510, 732 P.2d 9 (Or.1987).

(1960). In *Braunfeld,* the United States Supreme Court upheld Sunday closing laws even though it acknowledged that Sunday closings made the practice of their religious beliefs more expensive for Saturday Sabbatarians, by forcing them to close their businesses two days a week—Saturday (per religious compulsion) and Sunday (per state compulsion). In upholding the Pennsylvania statute, the Court stated that "to strike down ... legislation which imposes only an indirect burden on the exercise of religion, i.e. legislation which does not make unlawful the religious practice itself, would radically restrict the operating latitude of the legislature." *Id.* at 606, 81 S.Ct. at 1147.

As the Court analyzed the issues in *Braunfeld,* the direct burden imposed by the statute—Sunday closing and the financial losses attributable thereto—fell equally on all persons. That the closing, in the end, had a greater adverse impact on Saturday Sabbatarians was, in the Court's view, an indirect result of the fact that members of those religions closed their places of business on Saturdays as well. In the Court's view, the law did not regulate or prohibit Saturday closings, (in which case it would have constituted a direct burden on Saturday Sabbatarians) but only Sunday operations. From this, the Court concluded that the statute did not directly regulate or prohibit a religious practice (Saturday closings) but merely regulated a non-religious one (Sunday business operations); accordingly, any effect on the religious practice was, in the Court's view, "indirect." [4]

Here, by contrast, shunning is an actual practice of the Church itself, and the burden of tort damages is direct. Permitting prosecution of a cause of action in tort, while not criminalizing the conduct at issue, would make shunning an "unlawful act." *Langford v. United States,* 101 U.S. (11 Otto) 341, 345, 25 L.Ed. 1010 (1879) ("[T]he very essence of a tort is that it is an unlawful act."). Imposing tort liability for shunning on the Church or its members would in the long run have the same effect as prohibiting the practice and would compel the Church to abandon part of its religious teachings. Were we to permit recovery, " 'the pressure ... to forego that practice [would be] unmistakeable,' " *Thomas v. Review Board,* 450 U.S. 707, 717, 101 S.Ct. 1425, 1431, 67 L.Ed.2d 624 (1981) (quoting *Sherbert v. Verner,* 374 U.S. 398, 404, 83 S.Ct. 1790, 1794, 10 L.Ed.2d 965 (1963)). The Church and its members would risk substantial damages every time a former Church member was shunned. In sum, a state tort law prohibition against shunning would directly restrict the free exercise of the Jehovah's Witnesses' religious faith.[5]

In *Cantwell v. Connecticut,* the Supreme Court faced a claim of a direct burden on religion. 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). There, the appellant, also a Jehovah's Witness, was convicted of inciting a breach of the peace. Cantwell had stopped two men on the street and asked their permission to play a phonograph record entitled "Enemies." The record was a general attack on organized

---

**4.** The reasoning of *Braunfeld* has been substantially undermined by subsequent cases. *See, e.g., Hobbie v. Unemployment Comm'n,* —— U.S. ——, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987); *Thomas v. Review Bd.,* 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981); *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). In any event, for reasons set forth in the text immediately following, *Braunfeld* is not controlling.

**5.** At oral argument, both counsel seem to agree on the principle that if the behavior of the religious organization in question were criminal, the state would have a sufficient interest to overcome first amendment protections. This position is clearly incorrect. Whether a state

labels a particular type of behavior criminal or whether it enables private citizens to enforce substantive rules of behavior through tort laws is not dispositive of the constitutional question. As the Supreme Court noted in *New York Times v. Sullivan,* "we are compelled by neither precedent nor policy to given any ... weight to ... 'mere labels' of state law." 376 U.S. at 269, 84 S.Ct. at 720. *See also McDaniel v. Paty,* 435 U.S. 618, 627 n. 5, 98 S.Ct. 1322, 1328 n. 5, 55 L.Ed.2d 593 (1978) (noting that the Court will "consider" the state's application of a label, although "we are not bound by it"). The constitutional analysis always entails an examination of the interest behind the state regulation—whether criminal, administrative, or tort.

religions, in particular the Roman Catholic Church. Upon listening, the two men were highly offended: "one of them said he felt like hitting Cantwell and the other that he was tempted to throw Cantwell off the street." *Id.* at 309, 60 S.Ct. at 905. Although Cantwell's conduct did not in itself breach the peace, the reaction it produced—and had been likely to produce—was a violation of the law.

In finding the conviction of Cantwell to be barred by the first amendment, the Court recognized that "[i]n every case the power to regulate [religious conduct] must be so exercised as not, in attaining a permissible end, unduly to infringe the protected freedom [of the exercise of religion]." *Id.* at 304, 60 S.Ct. at 903. The Supreme Court noted that there had been "no assault or threatening of bodily harm." *Id.* at 310, 60 S.Ct. at 906. It held that the intangible harms caused by the exercise of Cantwell's religious belief were insufficient to justify the imposition of civil or criminal liability. The Court ruled that the state had failed to demonstrate that there was a "clear and present menace to public peace and order as to render [Cantwell] liable to conviction of the common law offense in question." *Id.* at 311, 60 S.Ct. at 906.

In *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), the Supreme Court once again struck down a burden on the free exercise of religion. The Court began its analysis by noting that in previous cases where it had upheld the imposition of burdens on the right to exercise religious beliefs freely the "conduct or actions so regulated have invariably posed some substantial threat to public safety, peace, or order." *Id.* at 403, 83 S.Ct. at 1793. Similarly, the Supreme Court reiterated its view that "[o]nly the gravest abuses, endangering paramount interests, give occasion for permissible limitation." *Id.* at 406, 83 S.Ct. at 1795 (quoting *Thomas v. Collins,* 323 U.S. 516, 530, 65 S.Ct. 315, 322, 89 L.Ed. 430 (1945)). More directly, the Court expressed its disapproval of state action similar to that which the plaintiff seeks here: "a fine imposed against appellant for her Saturday worship." *Id.* at 404, 83 S.Ct. at 1794. In *Sherbert,* what the Court termed a "fine" was only a denial of public benefits; here, the "fine" is actual money damages.[6]

---

**6.** We note that doctrinal development after *Sherbert* has been premised on the fact that the direct/indirect distinction is not controlling; rather, courts have looked to the effect of the regulation on the free exercise of religious beliefs in order to determine whether a burden exists. Professor Nowak and his collegues state the rule as follows: "Conditioning a significant benefit upon conduct prohibited by a religious belief places a substantial burden on the individual regardless of whether the burden can be labeled direct or indirect." J. Nowak, R. Rotunda, & J. Young, Constitutional Law 1062 (2d ed. 1983). The emergence of this analytic approach has substantially undermined the vitality of the Court's analysis in *Braunfeld.*

Many courts have read *Sherbert* and subsequent cases as requiring the creation of an exemption to rules governing eligibility for public benefits where a religious person cannot, consistent with his religion, qualify for public assistance. According to this view, where an otherwise valid state regulation creates a burden on the free exercise of religion, the state is required to demonstrate both that the regulation serves an unusually important interest and that granting an exemption for the religious objector (and his coreligionists) would "do substantial harm to that interest." L. Tribe, American Constitutional Law § 14–10, at 851–59. *See EEOC v. Pacific Press Publishing Ass'n,* 676 F.2d 1272,

1279 (9th Cir.1982); *cf. Bucklund,* 724 P.2d at 986 (formulating similar standard). *See also Goldman v. Weinberger,* 475 U.S. 503, 106 S.Ct. 1310, 1325, 89 L.Ed.2d 478 (1986) (O'Connor, J., dissenting) ("[G]overnment must show that the opposing interest it asserts is of especial importance before there is any chance that its claim can prevail [and] ... that the interest asserted will in fact be substantially harmed by granting the type of exemption requested by the individual."). The state must show that uniform application of its rule is the least drastic means available for the regulation's enforcement. *See, e.g., Callahan v. Woods,* 736 F.2d 1269, 1272 (9th Cir.1984) ("the 'least drastic means' inquiry ... is the critical aspect of the free exercise analysis."). *Cf. Hobbie,* 107 S.Ct. at 1049 ("[I]nfringement [on free exercise] must be subjected to strict scrutiny and could be justified only by proof by the State of a compelling interest.").

We do not think the exemption inquiry undertaken in benefits cases is particularly appropriate for claims that the state is directly burdening religion by prohibiting a practice of a religious organization through the creation of substantive rules of law—be they statutory or common law. However, were we to follow the exemption approach in Paul's case, we would make the same analysis and reach the same result we do in the text. From a practical

■ We find the practice of shunning not to constitute a sufficient threat to the peace, safety, or morality of the community as to warrant state intervention. The test for upholding a direct burden on religious practices is as stringent as any imposed under our Constitution. Only in extreme and unusual cases has the imposition of a direct burden on religion been upheld. *See, e.g., Reynolds v. United States,* 98 U.S. (8 Otto) 145, 25 L.Ed. 244 (1878) (polygamy); *Hill v. State,* 38 Ala.App. 404, 88 So.2d 880 (1956) (snake handling). The harms suffered by Paul as a result of her shunning by the Jehovah's Witnesses are clearly not of the type that would justify the imposition of tort liability for religious conduct. No physical assault or battery occurred. Intangible or emotional harms cannot ordinarily serve as a basis for maintaining a tort cause of action against a church for its practices—or against its members. *Cf. West Virginia State Bd. of Educ. v. Barnette,* 319 U.S. 624, 646, 63 S.Ct. 1178, 1189, 87 L.Ed. 1628 (1943) (Murphy, J., concurring) ("[T]he benefits that may accrue to society from the compulsory flag salute are [not] sufficiently definite and tangible to justify the invasion of freedom and privacy that is entailed."). Offense to someone's sensibilities resulting from religious conduct is simply not actionable in tort. *See Cantwell,* 310 U.S. 296, 60 S.Ct. 900; *cf. Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). Without society's tolerance of offenses to sensibility, the protection of religious differences mandated by the first amendment would be meaningless.

A religious organization has a defense of constitutional privilege to claims that it has caused intangible harms—in most, if not all, circumstances.[7] As the United States Supreme Court has observed, "[t]he values underlying these two provisions [of the first amendment] relating to religion have been zealously protected, sometimes even at the expense of others interests." *Yoder,* 406 U.S. at 214, 92 S.Ct. at 1532.

Providing the Church with a defense to tort is particularly appropriate here because Paul is a former Church member. Courts generally do not scrutinize closely the relationship among members (or former members) of a church. Churches are afforded great latitude when they impose discipline on members or former members. We agree with Justice Jackson's view that "[r]eligious activities which concern only members of the faith are and ought to be free—as nearly absolutely free as anything can be." *Prince v. Massachusetts,* 321 U.S. 158, 177, 64 S.Ct. 438, 445, 88 L.Ed. 645 (1944) (concurring).

The members of the Church Paul decided to abandon have concluded that they no longer want to associate with her. We hold that they are free to make that choice. The Jehovah's Witnesses' practice of shunning is protected under the first amendment of the United States Constitution and therefore under the provisions of the Washington state constitution.

## IV. Conclusion

We affirm the district court's grant of summary judgment in favor of the defendants, Watchtower Bible Societies of New York and Philadelphia. Although we recognize that the harms suffered by Janice Paul are real and not insubstantial, permitting her to recover for intangible or emotional injuries would unconstitutionally restrict the Jehovah's Witnesses free exercise of religion. The First Amendment of the United States Constitution and therefore the protections of the Washington Constitution provide the Jehovah's Witnesses' with a defense to the plaintiff's

---

standpoint, in most free exercise cases it is of no significance which of the two methods of inquiry is employed.

7. We also note that Paul has not presented evidence of actual malice sufficient to overcome the constitutional privilege afforded the defendants. While the privilege is a qualified one, the only evidence Paul has presented is that Church members have shunned her at the direction of the Church; she has neither alleged nor shown that members of the Church hierarchy were motivated by reasons unrelated to their interpretation of the dictates of their religion. *Cf. Jones v. Wolf,* 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979); *Turner v. Unification Church,* 473 F.Supp. 367 (D.R.I.1978), *aff'd,* 602 F.2d 458 (1st Cir.1979).

cause of action—the defense of privilege. The constitutional guarantee of the free exercise of religion requires that society tolerate the type of harms suffered by Paul as a price well worth paying to safeguard the right of religious difference that all citizens enjoy.

AFFIRMED.