[No. B010791. Second Dist., Div. Five. Dec. 30, 1987.]

LEONA McNAIR, Plaintiff and Respondent, v.
WORLDWIDE CHURCH OF GOD et al., Defendants and
Appellants.

**COUNSEL**

Greene, O'Reilly, Broillet, Paul, Simon, McMillan, Wheeler & Rosenberg, Antony Stuart and Michael L. Goldberg for Plaintiff and Respondent.

Browne & Woods, Horvitz, Levy & Amerian, Ellis J. Horvitz, Barry R. Levy, Daniel J. Gonzalez, Haight, Dickson, Brown & Bonesteel, Bruce A.

Armstrong, Roy G. Weatherup, Robert M. Dato, and Ralph K. Helge for Defendants and Appellants.

## OPINION

**HASTINGS, J.**[*]—In this case of first impression we are asked to determine whether the free exercise clause of the First Amendment of the United States Constitution bars a defamation suit brought against a church and two of its ministers for statements made during the course of a theological controversy. Should we find the suit is not barred, we then must identify the level of malice necessary to sustain an award of damages.

Plaintiff and respondent Leona McNair (respondent) brought an action for libel, slander, intentional infliction of severe emotional distress, invasion of privacy, and conspiracy against defendants and appellants Worldwide Church of God (the Church), Raymond McNair (McNair), and Roderick Meredith (Meredith). After a jury trial, judgment was entered in respondent's favor. She was awarded $260,000 compensatory and $1 million punitive damages.

### FACTS

To better understand the issues on appeal, we begin with a brief history of the Church. Herbert W. Armstrong founded the Church in 1933 when it was known as the Radio Church of God. The Church is a fundamentalist Christian faith with an hierarchical structure. Until his death in 1986, Mr. Armstrong was the Pastor General or Apostle and the spiritual leader of the Church. Below him in the leadership are a handful of evangelist ministers. Below the evangelists, in order of rank, are the pastors, elders, local elders and finally deacons. Guidance on matters of religious doctrine and administration is passed down from the leadership to the field ministry and congregation.

The Church's religious beliefs are rooted in the Old and New Testaments. Followers' lifestyles are determined by biblical strictures, e.g. observance of Sabbath on Saturdays, tithing, adherence to certain dietary laws. The Church also has strict views on the permanence of marriage, making divorce very difficult.

[*] Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.

The Church membership numbers approximately 100,000 with 1,000 ministers. Much of the growth of the Church was due to the 1947 founding of Ambassador College in Pasadena, where the Church is headquartered and where most of the Church's ministers have been educated.

Raymond McNair became a Church evangelist-minister in 1953 and a leader of the Church. One of the persons McNair baptized was respondent. On July 31, 1955, they were married. Foregoing the nursing for which she had been trained, respondent assisted McNair and, in accordance with Church practice, became "50 percent of his ministry." In 1958 McNair was sent to England to manage the Church's work overseas. At Mr. Armstrong's behest, McNair opened an Ambassador College campus in England in 1960. He was the deputy chancellor of this college as well as the director of Church work for Europe, Africa, the Middle East, Asia and Australia. McNair was also regional editor of the Church's publications for which he wrote many articles. Assisting McNair in all his works and traveling extensively with him, respondent became known in the Church as the "first lady of England," corresponding to Mrs. Armstrong's status as "first lady in the Church."

All went well until 1973 when a Church division developed, pitting "conservatives" against "liberals." The latter group promoted changes which would liberalize various church teachings. Among several controversial issues was the Church's teaching on divorce and remarriage. Up to this time, the Church recognized only two grounds for divorce and permissible remarriage: porneia, defined as gross immorality, and fraud. Those divorced persons who wished to be baptized also had to abide by this teaching even if it meant leaving a new spouse. In 1974, a third ground was added: "desertion by the unconverted mate."[1] Also, under the new doctrine, divorces prior to conversion into the faith were forgiven, regardless of the grounds for divorce.

McNair allied himself with the Church conservatives and fought against the various changes. In 1973, McNair returned to become deputy chancellor of Ambassador College in Pasadena. Because the "liberals" were on the ascendancy, McNair was demoted to the position of senior editor of the Church's main publication, Plain Truth.

Though McNair remained faithful to the Church, respondent became embittered by this treatment. Because McNair's demotion meant a cut in

---

[1] The concept of desertion was derived from scripture, 1 Corinthians, chapter 7, verse 15, which provides that if a nonbeliever departs, one is no longer bound. If the nonbeliever was found "not pleased to dwell," a scriptural concept, the believer would no longer be bound to dwell with a nonbeliever in marriage.

salary, respondent was concerned with the family financial situation. Unbeknownst to McNair, she began to investigate the possibility of reactivating her nursing license. As time passed, respondent became increasingly discontented with the Church and, what she perceived as, its hypocrisy. She began to attend meetings organized by a former Church minister who was similarly disgruntled, Ernest Martin. Respondent also financially contributed to and associated with the editors of Ambassador Review, a publication founded by former dissatisfied Church ministers and members. It featured articles critical of the Church's practices.

Eventually McNair learned about respondent's activities, and in 1974 he confronted her. After McNair's warnings, respondent continued to attend the Martin meetings and to associate with the *Ambassador Review*. Their personal relationship deteriorated rapidly. McNair removed respondent from the checking account, temporarily denied respondent use of the family car, and told her he'd rather she not pursue her career plan. Respondent refused to acquiesce, and in January, 1975, McNair moved out of their bedroom. A brief unsuccessful attempt at reconciliation was made in April, 1975.

McNair, counseled by Herbert Armstrong, filed for divorce in June 1975. Respondent was served in July 1975. McNair remained living in the house until July 1976. The divorce became final in September 1976. In the eyes of the Church the grounds for the divorce were "desertion by the unconverted mate" (here, respondent). McNair was the only evangelist minister within the Church who had ever divorced.

McNair and respondent went their separate ways. Respondent regained her nursing license and worked as a private duty nurse. Their oldest child, Ruth, was an adult; she chose to live with respondent, as did their youngest child, Joe. Bruce, their third child and elder son, chose to live with McNair. In June 1977, McNair married Evelyn McNair, a church member. In 1977, McNair regained his seat on the Church's board of directors and, the following year, his appointment as deputy chancellor of Ambassador College.

The third individual involved in this suit is Roderick Meredith. Meredith and McNair attended Ambassador College together; he graduated in 1952, and also became an evangelist minister. In 1955, he presided over McNair's and respondent's marriage and later married McNair's sister. In 1960, he conducted a marriage counseling session between McNair and respondent. During her trial testimony, respondent described this session as lasting four and a half hours and consisting of "railing accusations." McNair and Meredith both offered contradictory testimony.

At all times pertinent to this litigation, Meredith was director of pastoral administration for the Church. It was his responsibility to clarify doctrinal issues within the ministry around the world. He also counseled ministers who experienced personal problems.

As noted earlier, the Church's 1974 action changing the rules on divorce and remarriage had caused much controversy and discussion. A "profound lack of understanding" continued throughout the ministry for several years after the changes. The controversy heightened when the 1976 McNair divorce became known. This was so because both McNair and respondent had been Church members when they exchanged marriage vows; had lived together 20 years adhering to Church teachings; neither had walked out on the other; and both had enjoyed prominent positions in the Church. McNair's 1977 remarriage placed him in the center of the controversy. Had his divorce been improper he would be seen as living in adultery, and there would appear to be a "double standard."

Simultaneous with this controversy, the Church experienced further turmoil when our state Attorney General placed it under receivership in early 1979.[2] There was considerable controversy and publicity surrounding this action. Respondent was seen at one of the demonstrations organized by dissidents in the church, held near the Ambassador College campus. In early 1979, she and one of the persons involved in the Attorney General suit unsuccessfully attempted to enter a Church sabbath service. Meredith was aware of respondent's action and asked the congregation to consider respondent as a person who "was no longer with us," a Church practice known as "marking."[3] By letter dated February 12, 1979, respondent was informed of this action.

Against this backdrop, the Church's annual meeting of ministers, the Ministers' Conference, was held in Tucson, Arizona in January, 1979. There were approximately 1,000 in attendance: ministers, their wives, and support staff. The proceedings were videotaped.

Since the controversy regarding divorce and remarriage persisted, the subject was a topic of discussion during this conference. As director of pastoral administration, Meredith considered it his responsibility to address this issue. He was aware that some ministers in attendance were accusing

---

[2] This court later ruled the receivership had been unconstitutional and void. (*People* ex rel. *Deukmejian* v. *Worldwide Church of God, Inc.* (1981) 127 Cal.App.3d 547 [178 Cal.Rptr. 913].)

[3] According to Meredith's testimony, "marking" is done before the local congregation; Church members are to avoid spiritual fellowship or contact with a "marked" person, who is seen as causing division within the Church.

him and McNair of hypocrisy in permitting McNair's divorce and remarriage. Meredith was concerned about an increase in the number of divorces and remarriages being allowed by ministers. With these concerns in mind, he rose to address the ministers. His speech, which lasted three and one-half hours, included the following remarks, which are the basis for the slander action

"Mr. Raymond McNair's wife is also a newer wife in the ministry but has been in God's church I think twelve or fifteen years, something like that. And I think most of you know and I want to say this here. I don't think Raymond and Evelyn will mind; they might be a little embarrassed but Evelyn . . . had a husband that really mistreated her very much years ago. And this divorce was way back before [her] decision and that was way, way back, but most of you who know the situation with Mr. McNair, and I just want to say it because again there has been some scurrilous, foul garbage, we could use a wronger [sic] term, floating around to try to discredit him. But I personally know about it, not just from hearing him tell about it, but by being in his house during part of this time and my two sons playing with their cousins, not playing with, but visiting with and staying over weekends with their cousins Bruce and Joe when his first wife had left the church and was virtually cursing him, cursing Mr. Armstrong, with curse words, spitting literally in people's faces and as hateful as a human being could be. And God does tell us and the whole Church of God decided long before this ever came up with Mr. McNair back in First Corinthians 7:15 'But if the unbelieving depart,' and I tell you before God and Christ, she sure departed. I mean she departed so far that she is one of the major enemies of God's Church in Southern California and remains so to this day has been working actively and ferociously with the *Ambassador Review.* Tried to call me personally and get me to give them an interview here a year or so ago which I would not do. Everyone else that attends their meetings, attended Dr. Martin's meeting, fighting us, and fighting us actively. And 'if the unbelieving depart, let him depart. A brother or a sister is not under bondage . . .' or as the Greek word is used here, *luo,* I believe it is, the same word that is used for bound, in other words is not bound, is not *luo,* '. . . in such cases: but God has called us to peace,' and we've come to realize that what God has bound he can unbind. That's part of our understanding on divorce and remarriage which the whole Church came to back in 1974. And so after about two solid years of living without a wife and a virtual hell on earth Mr. McNair was encouraged by Mr. Armstrong and by Garner Ted Armstrong,[4] and this is not a matter of a secret because he told me that he'd done that with Raymond and he told others, Ted Armstrong that is and

---

[4] At trial, Meredith conceded he had been misinformed about the Armstrongs' role in McNair's divorce. They counseled McNair a divorce would be permitted but did not encourage him.

Mr. Armstrong. Both encouraged Raymond to put her away and divorce her since she was just simply wanting to keep him on the string and get a free ride while she cursed him and would not have anything to do with him. There was not even a way of saying hello in a friendly way, living in opposite ends of the house in an armed truce or an armed hell, and the way to do was to put her away and do what First Corinthians 7:15 said on the advice of the two top men in God's work. And so he had done that after about a year and a half, or whatever, and finally, also, several months later, married his present wife. And he is not married to anyone else but his present wife according to the understanding God's Church came to back in 1974. Thank you very much. So I hope we can all understand that and not accept this garbage that is trying to be thrown at every leading man in God's Church in one way or the other by Satan, the devil, through those whom he would use. So anyway, I hope we understand that . . . ."

Apparently, these remarks did not completely clarify the Church's teachings. Ron Kelley, a Church evangelist who supervised ministers in the Rocky Mountain States, wrote a two-page memorandum, entitled "Marriage & Divorce; A Greater Problem Than Ever." The memo was received at headquarters on June 19, 1979. In the third paragraph, Kelley noted, "No one has ever explained the Raymond McNair problem to the Church members. Many members simply cannot understand how such a long time 'leading' Minister and Evangelist can be free to remarry when the marriage occurred in the Church and lasted for more than 20 years." The memo discussed the overall divorce problem in the church and concluded, "This is a burning and nagging question within the Church and needs thorough doctrinal research and then official publication so members can know." This memo came to McNair's attention who discussed it with Meredith and other ministers. The outcome of these discussions was an article in the June 25, 1979, Pastor's Report, authored by Meredith. [5] It stated: "Now, fellow ministers, I would like to discuss something that is becoming an increasingly *critical problem* within the ministry and within God's Church as a whole—especially herein the United States. Increasing numbers of our church members are beginning to divorce their mates for, it seems, almost ANY conceivable reason! What's more, they then expect to 'remain in the Church' and probably REMARRY *someone else* in the Church—perhaps their former friend's wife who has, by now, divorced him, and is also 'still in the Church.'

"We are going to have long doctrinal and theological discussions with Mr. Herbert Armstrong to cover and thoroughly understand any *legitimate* reasons for divorce and remarriage. *However,* as of this writing, there are

---

[5] The Pastor's Report is a private, weekly publication by the Church for its full-time ministers and a few others, such as Ambassador College faculty.

only THREE that God's Church has officially recognized as legitimate: (I) *Porneia*—that is gross immorality involving unadmitted fornication before marriage or a very *serious* or continuing type of adulterous or homosexual or similar relationship after marriage, (II) *Fraud*—this is the case where one is "tricked" in some way and we have *always* understood and recognized this as an action that would in fact 'annul' a marriage since God would never bind a union based on fraud in the first place, (III) *Desertion*—by the unconverted mate—although this was accepted and taught by the Church long before his action, a classic example of this would be Mr. Raymond McNair's situation. His wife *refused* to be a wife to him for over two years—to sleep with him, cook for him, or even *civilly* communicate with him in a decent manner. Rather, she had *left* God's Church and was actively FIGHTING God's Church *and Mr. McNair,* turning his children against him and literally *cursing* him to his face. Finally, upon advice of Mr. Armstrong *and* Ted Armstrong, he was finally forced to make legal the already existing FACT that she had *deserted him* and was no longer his wife *in any way whatsoever.*

"I repeat, these three exceptions are the ONLY ones recognized by God's Church as biblical reasons for people who are *already converted* to divorce a mate. Perhaps even we in the ministry need to realize more vividly the meaning of Jesus' statement: 'What therefore God hath joined together, *let no man put asunder.*' (Matt. 19:6.)" (Italics in original.)

Respondent learned about these statements in the Pastor's Report from a friend during a casual conversation at the supermarket. Subsequently, she heard the tape of Meredith's speech at the Ministerial Conference. She was devastated, and her emotional distress manifested itself in several physical and mental disorders.

## PROCEDURAL HISTORY

Respondent filed her original complaint on July 13, 1979. It alleged two causes of action for libel and intentional infliction of emotional distress, arising solely from the Pastor's Report. The Church, Ambassador International Foundation and the Ambassador College were named as defendants. On October 4, 1979, respondent's first amended complaint was filed; it added causes of action for invasion of privacy, slander per se and slander, arising out of Meredith's remarks at the 1979 Ministerial Conference. Respondent's second amended complaint, the operative one on appeal, was filed September 23, 1980, and named as additional defendants Meredith, McNair, Herbert Armstrong and other individuals. It added a cause of action for civil conspiracy.

Trial commenced on July 3, 1984. On August 23, 1984, after one day of deliberations, the jury returned a special verdict, in which it found the following:

1. The statements made at the ministerial conference and in the Pastor's Report were not privileged and were not true;

2. In making the statements in the Pastor's Report, defendants "intentionally caused, by extreme and outrageous conduct, severe emotional distress to plaintiff, or acted with reckless disregard of the probability of causing emotional distress to the plaintiff";

3. Plaintiff's severe emotional distress was a proximate result of the conduct of the defendants;

4. Defendants' wrongful acts were "done pursuant to a conspiracy to either libel, slander, or intentionally cause, by extreme and outrageous conduct, severe emotional distress to the plaintiff"; and plaintiff was damaged as a result of these acts;

5. The jury found in favor of plaintiff and against all three defendants.

THE APPEALS:

The Church, McNair and Meredith appeal. Each joins in the other's arguments. The Church argues reversal is mandated because the First Amendment of the United States Constitution bars this suit. We do not list or discuss numerous other issues raised because we decide this appeal on the constitutional issue.

In addition to the constitutional issue, McNair and Meredith contend respondent's action is barred by the statute of limitations.

DISCUSSION

■ "State laws whether statutory or common law, including tort rules, constitute state action." (*Paul* v. *Watchtower Bible Tract Soc. of New York* (9th Cir. 1987) 819 F.2d 875, 880.) In *New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254, 265 [11 L.Ed.2d 686, 697, 84 S.Ct. 710, 95 A.L.R.2d 1412], the United States Supreme Court held that state libel laws are subject to First Amendment constraints. It follows that state slander laws are similarly constrained.

The First Amendment provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances." The free exercise clause guarantees the protection of two concepts: freedom to believe and freedom to act. (*Cantwell* v. *Connecticut* (1940) 310 U.S. 296, 303-304 [84 L.Ed. 1213, 1219-1220, 60 S.Ct. 900, 128 A.L.R. 1352].) The freedom to believe is absolute. However, religious conduct may be subject to regulation for the protection of society. (*Ibid.*) [6] In order for a regulation, or burden, to pass constitutional muster, the action to be regulated must pose some substantial threat to public safety, peace, or order. (*Sherbert* v. *Verner* (1963) 374 U.S. 398, 403 [10 L.Ed.2d 965, 970, 83 S.Ct. 1790].)

The instant appeal presents issues which concern the freedom to act in the exercise of one's religion. Numerous cases warn that " 'only the gravest abuses, endangering paramount interests, give occasion for permissible limitation' " on this freedom. (*Sherbert* v. *Verner, supra,* at p. 406 [10 L.Ed.2d at p. 972], quoting *Thomas* v. *Collins* (1945) 323 U.S. 516, 530 [89 L.Ed. 430, 440, 65 S.Ct. 315].) Here, we are asked to determine whether protection of a person's good name is a sufficiently important state interest that we allow the burden of tort damages to be imposed upon the Church's and its evangelist ministers' action.[7] We conclude that it is, subject to the limitations discussed below.

■ An individual's right to protect his/her good name has long been recognized. As one legal commentator has noted, "A millenium ago a slanderer could lose his tongue."[8] While today the consequences suffered by the defamer are not so drastic, there is no question that society continues to have ". . . a pervasive and strong interest in preventing and redressing attacks upon reputation." (*Rosenblatt* v. *Baer* (1966) 383 U.S. 75, 86 [15 L.Ed.2d 597, 605, 86 S.Ct. 669].) In *Dun & Bradstreet, Inc.* v. *Greenmoss Builders* (1985) 472 U.S. 749 [86 L.Ed.2d 593, 105 S.Ct. 2939], Justice Powell quoting *Rosenblatt, supra,* identified this interest as reflecting " ' ". . . no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty." ' " (*Dun & Bradstreet, supra,* at p. 758 [86 L.Ed.2d at p.

---

[6] Cases which have upheld a direct burden on religious practice are *Reynolds* v. *United States* (1878) 98 U.S. 145 [25 L.Ed. 244] (polygamy); and *Hill* v. *State* (1956) 38 Ala.App. 404 [88 So.2d 880] (snake handling); *Prince* v. *Massachusetts* (1943) 321 U.S. 158 [88 L.Ed.2d 645, 64 S.Ct. 438] (religious proselytizing by children on public streets.)

[7] Imposition of money damages is a burden upon religious action. (*Paul* v. *Watchtower Bible Soc. of New York, supra,* 819 F.2d at p. 882.)

[8] Eaton, *The American Law of Defamation Through Gertz v. Robert Welch, Inc., and Beyond: An Analytical Primer* (1975) Va.L.Rev. pp. 1349-1451, 1350.

601].) California has codified this interest in Civil Code sections 44 through 46. Section 44 provides that defamation can be effected through either libel or slander, and sections 45 and 46 define these terms.[9] In *McCoy* v. *Hearst Corp.* (1986) 42 Cal.3d 835 [231 Cal.Rptr. 518, 727 P.2d 711], our Supreme Court acknowledged that "Society's interest in redressing the harm done one's reputation is strong." (*Id.* at p. 858.)

In this case, we must balance the reputational interest of our citizenry against the interests protected by the First Amendment's free exercise of religion clause.[10] To resolve the issues raised by this balancing, we look not to common law theories of defamation which speak in terms of truth as a defense, privilege and qualified privilege.[11] These have grown ". . . into a forest of complexities, overgrown with anomalies, inconsistencies, and perverse rigidities." (Eaton, *supra,* at p. 1350; see also, Prosser, Law of Torts (4th ed.) Defamation, § 111, p. 737 et seq.) Instead the analysis and theories set forth in *New York Times Co.* v. *Sullivan* (1964), *supra,* 376 U.S. 254, and its progeny are the foundation for our holding.[12]

In *New York Times Co.* v. *Sullivan, supra*; *Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323 [41 L.Ed.2d 789, 94 S.Ct. 2997]; and *Dun & Bradstreet, supra,* 472 U.S. 749, the Supreme Court balanced the reputational interests of the plaintiff against the rights protected by the First Amendment's free speech and free press clauses. The plaintiff in the *New York Times* case was an elected official suing the *New York Times* over the contents of an adver-

---

[9] Civil Code section 45 provides: "Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided or which has a tendency to injure him in his occupation."

Civil Code section 46 provides: "Slander is a false and unprivileged publication, orally uttered, and also communications by radio or any mechanical or other means which: [¶] 1. Charges any person with crime, or with having been indicted, convicted, or punished for crime; [¶] 2. Imputes in him the present existence of an infectious, contagious, or loathsome disease; [¶] 3. Tends directly to injure him in respect to his office, profession, trade or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business that has a natural tendency to lessen its profits; [¶] 4. Imputes to him impotence or a want of chastity; or [¶] 5. Which, by natural consequence, causes actual damage."

[10] Doctrinal explanation by a duly authorized minister is as much an exercise of religion as any other religious practice.

[11] For a discussion of defamation and the free exercise clause, see Sciarrino, *"Free Exercise" Footsteps in the Defamation Forest: Are "New Religions" Lost?* (1983) Am.J.Trial Adv., pages 57-121.

[12] We are aware of *Brewer* v. *Second Baptist Church* (1948) 32 Cal.2d 791 [197 P.2d 713], affirming a jury verdict against a church, its pastor and members of its board of deacons for defamatory remarks made about plaintiffs to support their dismissal from the church. The *Brewer* court based its holding on the very common law considerations which we have rejected and was decided long before *New York Times, Inc.* v. *Sullivan, supra,* 376 U.S. 254.

tisement printed in the paper. The court recognized that our country has "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." (*New York Times, supra,* 376 U.S. at p. 270 [11 L.Ed.2d at p. 701].) The court concluded that the constitutional guarantees prohibit ". . . a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." (*Id.* at pp. 279-280 [11 L.Ed.2d at p. 706].) This *New York Times* malice has come to be labeled "constitutional malice."

In the *Gertz* case, the plaintiff was a private individual who allegedly had been defamed by an article appearing in defendant's magazine. After acknowledging that it had ". . . struggled for nearly a decade to define the proper accommodation between the law of defamation and the freedoms of speech and press protected by the First Amendment" (*Gertz, supra,* 418 U.S. at p. 325 [41 L.Ed.2d at p. 797]), the court held that (1) public persons may recover for defamation only upon clear and convincing proof of constitutional malice (*id.* at pp. 342-343 [41 L.Ed.2d at pp. 806-807]); (2) all persons defamed by news media may recover presumed and punitive damages only if they establish liability by clear and convincing proof of constitutional malice (*Id.* at pp. 348-350 [41 L.Ed.2d at pp. 810-811]); states may not impose liability without fault but may define the level of fault required for recovery by private persons defamed by the news media (*Id.* at pp. 347-348 [41 L.Ed.2d at pp. 809-810]); and (4) the states' interest in protecting reputation extends no further than compensation for actual injury; therefore, a private person defamed by news media must show constitutional malice before presumed or punitive damages may be imposed. (*Id.* at pp. 349-350 [41 L.Ed.2d at pp. 810-811].)

In *Dun & Bradstreet, Inc.* v. *Greenmoss Builders* (1984) *supra,* 472 U.S. 749, plaintiff sued a credit reporting agency which incorrectly reported plaintiff had filed for bankruptcy. The Supreme Court held that the rule of *Gertz* did not apply when the false and defamatory statements did not involve matters of public concern. (*Id.* at pp. 759-760 [86 L.Ed.2d at pp. 602-603].) It concluded that plaintiff's credit report concerned no public issue. (*Id.* at p. 762 [86 L.Ed.2d at pp. 604-605].)

Taking its cue from *New York Times,* California requires proof by clear and convincing evidence of constitutional malice before a public official or one determined to be a public figure may recover damages for a defamatory falsehood related to his/her official conduct. (*McCoy* v. *Hearst Corp., supra,*

42 Cal.3d at 841.) In dicta, this court has held that when a private individual, as distinguished from a public figure, sues a media defendant for defamation, a negligence standard of proof applies. (*Widener* v. *Pacific Gas & Electric Co.* (1977) 75 Cal.App.3d 415, 433 [142 Cal.Rptr. 304], cert. denied (1978) 436 U.S. 918 [56 L.Ed.2d 759, 98 S.Ct. 2265], overruled on other grounds by *McCoy* v. *Hearst Corp., supra*.)

These rules were developed by the courts to protect the constitutional guarantees of free speech and free press. We hold that the right to free exercise of religion is a constitutional guarantee of equal significance. Throughout our history, our courts have reiterated the importance and special place the free exercise clause enjoys in our constitutional scheme. As noted by the United States Supreme Court in *United States* v. *Ballard* (1944) 322 U.S. 78, at page 87 [88 L.Ed. 1148, at page 1154, 64 S.Ct. 882], "The Fathers of the Constitution were not unaware of the varied and extreme views of religious sects, of the violence of disagreement among them, and of the lack of any one religious creed on which all men agree. They fashioned a charter of government which envisaged the widest possible toleration of conflicting views. Man's relation to his God was made no concern of the State. He was granted the right to worship as he pleased and to answer to no man for the verity of his religious views." (See also *Serbian Orthodox Diocese* v. *Milivojevich* (1976) 426 U.S. 696 [49 L.Ed.2d 151, 96 S.Ct. 2372]; *Wisconsin* v. *Yoder* (1972) 406 U.S. 205 [32 L.Ed.2d 15, 92 S.Ct. 1526]; *Sherbert* v. *Verner, supra,* 374 U.S. 398; *Cantwell* v. *Connecticut, supra,* 310 U.S. 296; *Paul* v. *Watchtower Soc. of New York, supra,* 819 F.2d 875; *Church of Scientology of Cal.* v. *Siegelman* (S.D.N.Y. 1979) 475 F. Supp. 950; *Miller* v. *Catholic Diocese of Great Falls* (Mont. 1986) 728 P.2d 794.)

Our accommodation of the competing interests of our society—one protecting reputation, the other, the free exercise of religion—requires that we hold that in order for a plaintiff to recover damages for defamatory remarks made during the course of a doctrinal explanation by a duly authorized minister, he/she must show, by clear and convincing evidence, that the defamation was made with constitutional malice, that is with knowledge that it was false or with reckless disregard of whether it was false or not. Whether a plaintiff is a "public figure" or the method of publication is via a "newspaper" is irrelevant under this holding.

Here, Meredith's allegedly defamatory remarks were made while explaining the Church's newly developed and misunderstood doctrine on divorce and remarriage, first at the pastoral conference in Tucson and then in the Pastor's Report. All parties agree there was confusion throughout the Church regarding the addition of the third ground for divorce (desertion by

the unconverted mate) and the McNairs' divorce and his remarriage. Respondent contends that the defamation was gratuitous, totally outside the context of any legitimate discussion of a religious dispute. Nonetheless, we cannot ignore the crucial fact that Meredith's remarks were made while he was explaining Church doctrine.[13] As noted above, the First Amendment mandates a jealous guarding of religious practice unless it endangers a paramount interest of the state. (*Sherbert* v. *Verner, supra,* 374 U.S. 398.) The holding we have articulated strikes an appropriate balance between our citizens' reputational interests and our society's interest in protecting the right to free exercise of religion.

■ The record indicates that the jury was charged with instructions which do not require a finding of constitutional malice, as we have defined it. While appellants had requested such as instruction, the court instead accepted those offered by respondent, over appellants' objection. BAJI No. 7.06 defined actual malice as follows: "Actual malice is a state of mind. It is actual hatred or ill will by the defendant against the plaintiff which induces publication. Malice may not be implied or inferred merely from the fact of publication or merely from negligence in publication. However, actual malice may be proved by either direct or circumstantial evidence." Special instruction No. 12 provided, "In deciding whether the statements published were true or false, you may not consider whether the defendants believed the statements were true. You must only consider whether or not the statements were objectively false."[14] These instructions are framed in the language of negligence. We have concluded that the First Amendment requires *New York Times* constitutional malice instructions which require a finding that defendant's defamatory statements were made "with knowledge that it was false or with reckless disregard of whether it was false or not" (*New York Times, Co. supra,* 376 U.S. 254), focusing not on whether the statement was objectively true or false, but on defendant's knowledge of whether the statement was true or false.

■ In First Amendment media cases, the role of the appellate court is to review the record independently to decide whether ". . . the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof

---

[13] Our opinion is based on the unique facts of this case that involve a former well-known and important member of the church (respondent) in a controversy that raises questions concerning church doctrine and teachings. We are not saying that explanation of church doctrine per se can shield the speaker or writer from a negligence action for libel or slander. There certainly must be a nexus between the person allegedly slandered or libeled and the religious activity involved. Accordingly, any determination of the malice required must be decided on a case by case basis.

[14] The authority cited for this instruction was *Emde* v. *San Joaquin County etc. Council* (1943) 23 Cal.2d 146 [143 P.2d 20, 150 A.L.R. 916].

of 'actual malice.' [Citations.]" (*McCoy* v. *Hearst Corp., supra,* 42 Cal.3d at p. 842, quoting *Bose Corp.* v. *Consumers Union of U.S., Inc.* (1984) 466 U.S. 485, 510-511 [80 L.Ed.2d 502, 523, 104 S.Ct. 1949].) In this case, the record does not support a finding by us that respondent presented evidence which crossed this "constitutional threshold."

█ Meredith and McNair also have raised a statute of limitations argument. They contend that respondent was not entitled to substitute them for Does I and II, pursuant to Code of Civil Procedure section 474, because she knew their identities.[15]

The pertinent facts are as follows: Meredith's speech to the Ministers' Conference was made in January 1979; the article in the Pastor's Report was published on June 25, 1979. Respondent filed her original complaint for libel on July 13, 1979, against the Church and Does 1-50. Attached to this complaint was a copy of the allegedly libelous Pastor's Report article which designated Meredith as the author. On October 4, 1979, respondent filed her first amended complaint, adding the slander cause of action and alleging she had heard the tape of Meredith's Ministers' Conference remarks in August or September 1979. This complaint contained a verbatim quote of the remarks but did not name Meredith or McNair as defendants. On June 16, 1980, pursuant to Code of Civil Procedure section 474, respondent substituted Meredith and McNair for Does 1 and 2. On September 26, 1980, respondent filed her second Amended Complaint, naming Meredith and McNair and also Does I through XXX.

Meredith's and McNair's argument that respondent was not entitled to substitute under section 474 because she knew their identities fails because it is based on a literal and very narrow reading of the statutory language. Section 474 is to be construed liberally to enable a plaintiff to commence an action before it has become barred by the statute of limitations. (*Dieckmann* v. *Superior Court* (1985) 175 Cal.App.3d 345, 355 [220 Cal.Rptr. 602].) "[A] plaintiff is deemed 'ignorant of the name of a defendant' if he knew the identity of the person but was ignorant of facts giving him a cause of action against the person." (*Barnes* v. *Wilson* (1974) 40 Cal.App.3d 199, 205 [114 Cal.Rptr. 839].) Here, respondent's slander cause of action did not accrue until she heard the allegedly defamatory remarks and became distressed (*Manguso* v. *Oceanside Unified School Dist.* (1979) 88 Cal.App.3d 725, 731 [152 Cal.Rptr. 27]), and both McNair and Meredith acknowledge this was not until August or September 1979, when she received a tape of Meredith's

---

[15] Code of Civil Procedure section 474, in pertinent part, provides: "When the plaintiff is ignorant of the name of a defendant, he must state that fact in the complaint . . . and such defendant may be designated in any pleading or proceeding by any name, and when his true name is discovered, the pleading . . . may be amended accordingly; . . ."

remarks. Respondent learned of the allegedly libelous article in the Pastor's Report in late June or early July 1979. Respondent's amendment designating Meredith and McNair as Does 1 and 2 was filed June 16, 1980, within the one-year statutes of limitation applicable to both causes of action. (Code Civ. Proc., § 340, subd. (3).)

Having reached these holdings, we need not address the various other issues raised by appellants.

The judgment is reversed and the cause remanded for a new trial consistent with the requirements of this opinion. Each to bear own costs.

Feinerman, P. J., and Ashby, J., concurred.

On January 27, 1988, the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied March 17, 1988. Mosk, J., and Broussard, J., were of the opinion that the petition should be granted.