[No. B100535. Second Dist., Div. Seven. Nov. 10, 1997.]

J.B. AGUERRE, INC., et al., Plaintiffs and Appellants, v.
AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY
et al., Defendants and Respondents.

**COUNSEL**

Shernoff, Bidart & Darras, Shernoff, Bidart, Darras & Arkin, Michael J. Bidart and Sharon J. Arkin for Plaintiffs and Appellants.

Sedgwick, Detert, Moran & Arnold, Lane J. Ashley and Robert F. Helfing for Defendants and Respondents.

**OPINION**

**NEAL, J.—**

SUMMARY

A liability insurer was not in bad faith in funding a settlement with a contribution from its insured where the insured allegedly feared punitive damages, the insurer did not coerce the contribution, the contribution was modest and in reasonable proportion to punitive damage exposure, and where the contribution was the product of collusion between the insured and claimant. We affirm the trial court's judgment for the insurer following sustaining of a demurrer.

FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs and appellants J.B. Aguerre, Inc., Jean B. Aguerre, and Claudia Aguerre (collectively Aguerre) appeal from an order sustaining a demurrer to their first amended complaint for bad faith breach of an insurance policy, without leave to amend.

Aguerre's first amended complaint alleged the following pertinent facts:

Aguerre operates a dairy business. Aguerre bought primary and excess auto liability policies from defendants and respondents American Guaranty and Liability Insurance Company and Zurich-American Insurance Company of Illinois (collectively Zurich). The primary policy had a limit of $1 million, the excess, $5 million.

The policies (attached with the first amended complaint) afforded coverage for "accidents."

The policy required Aguerre to:

"Assume no obligation, make no payment or incur no expense without our consent, except at the 'insured's' own cost.

". . . . . . . . . . . . . . . . . . . . . . .

"Cooperate with us in the investigation, settlement or defense of the claim or 'suit.' "

The policy included the following "no action" provision:

"LEGAL ACTION AGAINST US

"No one may bring a legal action against [Zurich] under this Coverage Form until:

". . . . . . . . . . . . . . . . . . . .

"Under Liability Coverage, we agree in writing that the 'insured' has an obligation to pay or until the amount of that obligation has finally been determined by judgment after trial."

Westenberg, Aguerre's employee, seriously injured Sandra, Jillian, and Kimberly Kersten (Kerstens) in an accident while driving Aguerre's truck insured under Zurich's policy. Westenberg was convicted of driving drunk at the time of the accident.

Kerstens sued Aguerre and Westenberg (Kersten action). Aguerre tendered defense of the Kersten action to Zurich, who agreed to defend.

The trial court ordered the Kersten action to a nonbinding "judicial" arbitration. (Code Civ. Proc., § 1141.10 et seq.). The award is an exhibit to Aguerre's first amended complaint. The arbitrator awarded the following damages:

*Sandra Kersten*

—General damages, $425,000

—Special damages, present and future medical expenses, $115,000

—Special damages, present and future lost wages, $30,000

*Thomas Kersten (husband)*

—General damages, loss of consortium, $5,000

—Special damages, lost wages, $388

*Jillian Kersten (child)*

—General damages, $1,250

—Special damages, present and future medical expenses, $50

*Kimberlee Kersten (child)*

—General damages, $1,800

—Special damages, present and future medical expenses, $418.49

The damages awarded to all four plaintiffs totaled $578,488.

The award further stated: "All Plaintiff's requests for punitive damages are denied."

Kerstens exercised their statutory right to a trial de novo (Code Civ. Proc., § 1141.20, subd. (b)) and rejected the arbitrator's award.

Several months after the arbitration Roger Stewart, personal counsel for Aguerre, wrote to Michael Bidart, who represents Aguerre in the present bad faith action. Stewart advised that Kerstens had, in the previous year, offered to settle the action for $1 million.

Aguerre alleges that Zurich was "put on notice" that Kerstens' claims were worth $2 million by another letter from Stewart, addressed to Mr. Skow at Zurich. The letter stated in part:

"As you know the plaintiff has reduced his demand from $4,000,000 down to $2,000,000. The co-defendant Westenberg has made some kind of a deal with the plaintiff and has now changed his story to very much implicate Mr. Aguerre personally in the events leading up to the accident.

"On behalf of my client J.B. Aguerre I urge you in the strongest terms to settle this case on behalf of the Aguerre defendants. The extent of plaintiff's injuries and damages, the undisputed skill of her counsel, and the aggravated circumstances of liability create a substantial possibility that a verdict for *general* damages could exceed the plaintiff's current settlement demand." (Italics added.)

The letter showed carbon copies to Mr. DeJesso of Zurich, "per request of Attorneys Bidart & Kemp," and to Michael Bidart.

Zurich declined to pay $2 million, but after negotiations offered to pay $1.6 million. The letter confirming this offer states that Zurich reserves its right to recover part or all of this sum from Aguerre, but will waive this right if Aguerre asserts no claims against Zurich.

Aguerre thereafter reached a settlement agreement with Kerstens under which Kerstens would receive the $1.6 million offered by Zurich. In addition:

"Aguerre agreed to prosecute a first party bad faith case [the present action against Zurich] and assign *the first level of proceeds* to Kersten so as to have her reach the $2 million level of damages. In the event Aguerre is not successful in the bad faith case, Aguerre would pay $25,000 to Kersten." (Italics added.)

Aguerre argues it agreed to this settlement under duress, because of fear that Kerstens might obtain a significant punitive damage recovery against Aguerre, not covered by insurance. Aguerre alleged that punitive damage exposure arose because Westenberg "made some kind of deal with [Kersten] and . . . changed his story to very much implicate Mr. Aguerre personally in the events leading up to the accident." Aguerre, however, has not alleged the particulars of Westenberg's statement, nor explained how the statement increased Aguerre's punitive damage exposure. Aguerre alleges it was bad faith for Zurich to decline to pay $2 million to Kerstens because "the case had a value of $2 million."

The $25,000 minimum additional compensation which Aguerre allegedly agreed to pay Kerstens if the bad faith case were unsuccessful is 1.56 percent of the $1.6 million sum Zurich paid to Kerstens. Further, it appears that Aguerre would be entitled under the alleged agreement to keep any recovery from Zurich exceeding the $400,000 "first level of proceeds" payable to Kerstens. The damages Aguerre seeks in the present action include punitive as well as compensatory damages.

Zurich demurred to the first amended complaint on two grounds. First, it argued that case law precluded liability for bad faith refusal to settle where the insured had not been subjected to a judgment in excess of policy limits. Second, it urged that the complaint was barred by the "no action" clause of the policy.

The trial court sustained the demurrer, without leave to amend.

Aguerre appealed.

## DISCUSSION

In *Comunale* v. *Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 661 [328 P.2d 198, 68 A.L.R.2d 883], and *Crisci* v. *Security Ins. Co.* (1967) 66 Cal.2d 425, 432 [58 Cal.Rptr. 13, 426 P.2d 173], the Supreme Court imposed liability on insurance carriers for judgments against their insureds which exceeded policy limits, where the insurers had declined to settle the cases for sums within the policy limits. ■ The court in *Comunale* stated

the rationale: "The insurer, in deciding whether a claim should be compromised, must take into account the interest of the insured and give it at least as much consideration as it does to its own interest. [Citation]. When there is great risk of a recovery beyond the policy limits so that the most reasonable manner of disposing of the claim is a settlement which can be made within those limits, a consideration in good faith of the insured's interest requires the insurer to settle the claim. Its unwarranted refusal to do so constitutes a breach of the implied covenant of good faith and fair dealing." (*Comunale*, *supra*, 50 Cal.2d at p. 659.)

The gravamen of this species of insurer bad faith lies in exposing the insured to a judgment for more money than the insurer is bound to indemnify, and accordingly, case law requires a *judgment in excess of policy limits* as an element of the claim. (*Finkelstein* v. *20th Century Ins. Co.* (1992) 11 Cal.App.4th 926, 929 [14 Cal.Rptr.2d 305]; *Doser* v. *Middlesex Mutual Ins. Co.* (1980) 101 Cal.App.3d 883, 891-892 [162 Cal.Rptr. 115].)

Croskey et al., California Practice Guide: Insurance Litigation (The Rutter Group 1997) ¶ 12:334 rev. #1, 1996, explains this requirement as follows: "The excess judgment is necessary to establish both the insured's liability to the injured party and the amount thereof for damages purposes in the subsequent 'bad faith' action against the insurer. After all, the insurer's refusal to settle may prove correct if a defense verdict is obtained or plaintiff's verdict comes in for less than policy limits."

Crucial to our present analysis, declining a reasonable offer to settle within policy limits is not the *only* insurer conduct respecting settlement which can give rise to bad faith liability. Croskey et al. explains: "Absent an excess judgment, there can be no bad faith action based on excess liability. [However] [*t*]*he insurer's refusal to settle may be actionable on some other basis* (see ¶12:575 ff.) . . ." (Cal. Practice Guide: Insurance Litigation, *supra*, ¶12:340 rev. #1, 1996, italics added.)

For example, unreasonable insurer settlement conduct caused harm different from exposure to excess liability in *Bodenhamer* v. *Superior Court* (1987) 192 Cal.App.3d 1472, 1478-1479 [238 Cal.Rptr. 177] (burglar takes customer property from insured's jewelry store; coverage extends to customers; delay in settling alienates insured's customers, harming insured's goodwill); and in *Barney* v. *Aetna Casualty & Surety Co.* (1986) 185 Cal.App.3d 966, 978 [230 Cal.Rptr. 215] (insurer entered nuisance value settlement of claim *by* adverse driver which barred insured's claim *against* adverse driver). (See also Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶12:575 rev. #1, 1996.)

Here, Aguerre also claims a harm different from that in the "excess judgment" cases. Aguerre does not complain of exposure to a compensatory damage judgment exceeding the policy's dollar limits. Rather, Aguerre contends Zurich used Aguerre's fear of punitive damages to *unreasonably force Aguerre's contribution to a settlement.*

California cases have not specifically addressed the requisites for a bad faith claim in this setting. However, general principles of insurance law, and several out-of-state decisions, point the way to the proper analysis.

■ First, California public policy bars *indemnification* against punitive damage awards. (Ins. Code, § 533; Civ. Code, § 1668; *City Products Corp.* v. *Globe Indemnity Co.* (1979) 88 Cal.App.3d 31, 35 [151 Cal.Rptr. 494]; *Petersen* v. *Superior Court* (1982) 31 Cal.3d 147, 157 [181 Cal.Rptr. 784, 642 P.2d 1305]; *Ohio Casualty Ins. Co.* v. *Hubbard* (1984) 162 Cal.App.3d 939, 946 [208 Cal.Rptr. 806]; Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra,* ¶ 7:343 rev. #1, 1996; but see *Shell Oil Co.* v. *Winterhurst Swiss Ins. Co.* (1993) 12 Cal.App.4th 715, 739, 742 [15 Cal.Rptr.2d 815] [Insurance Code section 533 may not bar coverage for reckless conduct which may in certain circumstances justify punitive damages].)

Second, the insurer's obligation to *defend* extends to punitive damage claims, provided the policy does not conspicuously disclaim this duty. (*Ohio Casualty Ins. Co.* v. *Hubbard, supra,* 162 Cal.App.3d at p. 946.) The duty to defend includes hiring competent counsel, and "keep[ing] abreast of the progress and status of the litigation in order that it may act intelligently and in good faith on settlement offers." (*Merritt* v. *Reserve Ins. Co.* (1973) 34 Cal.App.3d 858, 882 [110 Cal.Rptr. 511].)

Several out-of-state cases address the insurer's duty of good faith in the specific context where punitive damages are sought against the insured. (*Magnum Foods, Inc.* v. *Continental Casualty Co.* (10th Cir. 1994) 36 F.3d 1491, 1506 [duty of good faith does not include paying money to settle uninsurable punitive damage claim, but does include "working cooperatively with [the insured] throughout in both defending and attempting to settle the entire case, with fair consideration given to the [insured's] concerns because of its exposure to the uninsured punitive damage claim"]; *Ging* v. *American Liberty Insurance Company* (5th Cir. 1970) 423 F.2d 115, 120-121 [in defending case requesting punitive damages, duty of good faith requires insurer to advise insured of settlement opportunities, warn of uninsured claims, and negotiate for settlement in good faith when insured's interests diverge from insurers].) These cases are consistent with California's general

rules, and indicate that the insurer, though not liable to indemnify against punitive damages, must reasonably assist and cooperate with the insured in defending and settling punitive damage claims.

■ We conclude that an insurer potentially can be liable for unreasonably coercing an insured to contribute to a settlement fund, even though (by definition) there is no "excess judgment" where a case is settled. Suppose, to frame an egregious hypothetical case, that an insurer advises its insured that the insured has very substantial punitive damage exposure; that punitive damages are not covered by the policy; and that, in order to settle, the insured must contribute the lion's share of a settlement. The insured follows the advice, and pays most of the settlement from its own pocket. In fact, the insurer's advice is intentionally false, and the insured had no serious punitive damage exposure. In this hypothetical, the insurer clearly was acting in bad faith. It failed to reasonably cooperate with the insured's defense against punitive damages, and instead, used the insured's concern about such damages to coerce the insured to pay most of the settlement, thus reducing the insurer's own outlay. We have no doubt that these hypothetical facts state a cause of action for bad faith, even though the insured did not suffer an excess judgment.

The theory advanced by Aguerre is similar to our hypothetical. Aguerre does not contend it was subjected to an excess judgment. Rather, Aguerre asserts a different theory of recovery: that fear of uninsured punitive damage exposure coerced Aguerre to contribute to a settlement. The trial court erred in sustaining the demurrer on the ground that Aguerre failed to allege a judgment in excess of policy limits, because Aguerre was proceeding on a different theory, requiring pleading and proof of different elements.

It also was error to conclude that the "no action" clause of the policy barred Aguerre's suit. We think Zurich's letter to Kerstens' counsel confirming that Zurich would pay $1.6 million is sufficient "agreement in writing that the 'insured' has an obligation to pay" to satisfy the "no action" clause, particularly given the terse and ambiguous nature of the clause,[1] and the usual rule requiring construction of policy language against an insurer.

These conclusions, however, do not dispose of the appeal. ■ We do not review the trial court's reasoning, but rather its ruling. A trial court's

[1]The clause does not state who must agree with whom (insurer and insured? insurer and claimant?), nor what they must agree on (that the insured is obliged to pay *some* amount? the specific amount that the insured must pay?). Nor does it specify the required level of formality of the "agreement." Is a written affirmation by the insurer's representative sufficient? Must the insurer sign? The insured or claimant sign? Is board authority required? Etc.

order is affirmed if correct on any theory, even if the trial court's reasoning was not correct. (*Davey* v. *Southern Pacific Co.* (1897) 116 Cal. 325 [48 P. 117]; Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 1996) ¶ 8:214.)

■ We conclude the trial court's ruling was correct, because Aguerre failed to plead facts sufficient to show that Zurich acted unreasonably in defending Aguerre and settling the case.

Aguerre's first amended complaint alleges no facts to show that Zurich coerced or attempted to coerce Aguerre to contribute to the settlement, whether by raising the specter of uninsured punitive damages, or otherwise. Aguerre does not even allege that Zurich *asked* Aguerre to contribute to the settlement fund.

Aguerre alleges only that Zurich refused to meet Kerstens' $2 million demand. But no facts are alleged to show this was unreasonable. Zurich had $6 million in total coverage, so there was no evident need to pay $2 million to avoid exposing Aguerre to a compensatory judgment in excess of policy limits. A neutral arbitrator had valued Kerstens' claims at $578,000, total, and Kerstens had previously made a formal, Code of Civil Procedure section 998 demand to settle the case for $1 million. Also, Kerstens had recently reduced their demand drastically, from $4 million to $2 million, movement that Zurich could reasonably conclude intimated there might be further "softness" in Kerstens' demand.

Further, there was no substantial reason for Zurich to believe that Aguerre had significant punitive damage exposure. The neutral arbitrator had flatly denied the punitive damage claim. Stewart's letter to Zurich warned of excess general damages, but not punitive damages. There is no allegation that Kerstens were insisting that an increased settlement was required because they had strong punitive damage claims against Aguerre.

In any event, we do not think Zurich was obliged to increase its settlement offer, beyond its evaluation of compensatory damage exposure, to pay Kerstens additional moneys to relinquish their punitive damage claims. Aguerre has not cited a case requiring this. The rule, as detailed above, is that an insurer is not obligated to indemnify against punitive damages. The same public policy which forbids an insurer from paying punitive damages in a judgment should likewise bar its payment of such damages, or some part thereof, in a settlement.

Of course, although Zurich was not obliged to pay compensation for punitive damages in a settlement, it was required, as part of its duty to defend, to accommodate and cooperate in any effort by Aguerre to buy peace from the punitive damage claims by contributing to the settlement. But there are no allegations here to show that Zurich in any way obstructed or refused to cooperate with Aguerre's negotiation of its contribution to the settlement.

Moreover, Aguerre's contribution of 20 percent of the total settlement, as alleged here ($400,000 contribution alleged by Aguerre, with $1.6 million contributed by Zurich), is to all appearances a reasonable contribution in a case where, in Aguerre's words, there is a "significant" punitive damage exposure. Indeed, punitive damage awards after trial frequently, if not typically, substantially exceed the concurrent compensatory award. The reason is easy to see: Punitive damages can be awarded only where there is "clear and convincing evidence" of "despicable conduct." (Civ. Code, § 3294.) The required strong evidence of bad conduct often prompts the jury to make a large punitive award. So, we see nothing unreasonable about an insurer participating in a settlement where the insured settles a "significant" punitive exposure by paying 20 percent of the settlement sum.

This conclusion becomes all the stronger when we look through the form of the alleged Aguerre-Kersten transaction to its economic substance. As Aguerre is honest enough to allege, it will only have to pay Kerstens $25,000[2] if the present bad faith action is unsuccessful. Aguerre only agreed to pay $400,000 to the extent that sum is recovered from Zurich. We assume the bad faith case is being handled on a contingent fee (there is no contrary allegation). The claimed $400,000 detriment to Aguerre is thus largely if not entirely a fiction. Aguerre's true exposure is on the order of $25,000, or 1.5 percent of the sum contributed by Zurich. If, as Aguerre asserts, there was "significant" punitive damage exposure, then Aguerre compromised it for a song. Aguerre obtained a bargain settlement.

In reality, there is every reason to conclude from Aguerre's pleading that there was *no* significant punitive damage exposure. The arbitrator flatly denied the punitive damage claim. Stewart's letter to Zurich urging settlement did not mention the words "punitive damages." Kersten's alleged agreement to accept minimum additional compensation of only $25,000

---

[2]Although numerous documents are attached with the first amended complaint, Aguerre has not attached any agreement between Aguerre and Kerstens governing the prosecution of the bad faith case, or requiring Aguerre to pay Kerstens anything. Thus we cannot know whether some contingency might relieve Aguerre entirely of the obligation to pay the $25,000.

strongly evidences that Kerstens and their counsel did *not* believe there was "significant" punitive damage potential as against Aguerre (on the other hand, there was no reason for Kerstens to turn Aguerre's offer down—Kerstens got a free ride, with a $400,000 upside potential).

Reflection on Kerstens' burden in trying to establish Aguerre's punitive damage liability further buttresses the conclusion that there was no "significant" exposure. No facts have been alleged to show that Aguerre had advance knowledge of Westenberg's unfitness to drive, or that Aguerre authorized or ratified Westenberg's drunk driving. Yet Kerstens had to prove one of these theories by clear and convincing evidence to recover punitive damages. (BAJI No. 14.73.1.)

In short, Aguerre's contention that there was "significant" punitive damage liability is belied by all the facts it pleads.

What we have here, at bottom, is an effort by Aguerre to concoct a bad faith claim out of whole cloth, or, in the words of Justice Klein in *Doser* v. *Middlesex Mutual Ins. Co., supra,* 101 Cal.App.3d pages 891-892, by collusion between the claimants and the insured, with the "ingenious assistance of counsel." In return for its alleged commitment to pay Kerstens $25,000, Aguerre has attempted to position itself to pursue a high stakes, bad faith case, seeking punitive damages, from which it hopes to emerge not only with the Kersten claim disposed of at no cost to Aguerre, but a profit as well in the form of damages recovered from Zurich.

Bad faith litigation is not a game, where insureds are free to manufacture claims for recovery. Every judgment against an insurer potentially increases the amounts that other citizens must pay for their insurance premiums.

We conclude the trial court's ruling sustaining the demurrer was correct.

Nor did the trial court err in denying leave to amend. It was Aguerre's burden in the trial court, and it is its burden here, to show that the first amended complaint could be further amended to state a cause of action. (*Hendy* v. *Losse* (1991) 54 Cal.3d 723, 742 [1 Cal.Rptr.2d 543, 819 P.2d 1]; Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs, *supra,* ¶ 8:136.3.) Aguerre made no such showing in the trial court, and makes none here.

## DISPOSITION

The judgment of the trial court is affirmed. Zurich shall recover its costs on appeal.

Johnson, Acting P. J., and Woods, J., concurred.

A petition for a rehearing was denied December 9, 1997, and appellants' petition for review by the Supreme Court was denied February 25, 1998.