[No. B175665. Second Dist., Div. Five. Sept. 20, 2005.]

JACK PETER VALOV, Plaintiff and Appellant, v.
DEPARTMENT OF MOTOR VEHICLES, Defendant and Respondent.

## COUNSEL

Law Offices of Orloff & Associates and Paul Orloff for Plaintiff and Appellant.

Bill Lockyer, Attorney General, Jacob Appelsmith, Assistant Attorney General, Elizabeth Hong and Brian D. Vaughan, Deputy Attorneys General, for Defendant and Respondent.

## OPINION

**KRIEGLER, J.**—We address appellant Jack Peter Valov's claim that respondent Department of Motor Vehicles (DMV) violated his right to the free exercise of religion under the First Amendment of the United States Constitution and article I, section 4 of the California Constitution when it refused to exempt him from state law requiring that driver's licenses "shall bear a fullface engraved picture or photograph of the licensee." (Veh. Code, §§ 12800.5, subd. (a), 12811, subd. (a)(1)(A) [prescribing that a driver's license shall contain, among other things, "a brief description and engraved picture or photograph of the licensee for the purpose of identification"].)[1] Valov, as an orthodox member of the Molokan religious faith, believes that the biblical injunction against "graven images" proscribes the photographing of a person's image. The DMV had previously exempted Valov from the statutory requirement that a license bear a photograph of the licensee's face. However, when Valov's license was due for renewal in 2003, the DMV informed him that, in light of public safety concerns and the state's interest in protecting its citizens' identities, it could no longer provide him with a religious exemption. Valov filed a petition for writ of mandate to compel the DMV to issue Valov a license without requiring a photograph. The trial court denied the petition and entered judgment against Valov.

---

[1] All further statutory references are to the Vehicle Code, unless otherwise stated.

Valov timely appealed the judgment. Assessing Valov's free exercise rights under both the United States and California Constitutions, we find that Valov was not entitled to a religious exemption from this state's neutral and generally applicable driver's license requirements. Accordingly, we affirm the judgment.

## STATEMENT OF FACTS

The parties agreed to a trial based on the submission of declarations and exhibits. The trial court ruled that all such materials were admitted into evidence. The following facts were uncontested. Valov is an orthodox member of the Molokan religious faith—a faith that accepts a literal interpretation of the biblical injunction against graven images, set forth in chapter 20, verse 4 of Exodus: "Thou shalt not make unto thee any graven images or any likeness of anything that is in heaven above, or that is in the earth beneath, or that is in the water under the earth." Valov believes that photographing a person's image violates that proscription.

There was no photograph requirement when Valov received his first California driver's license in 1944. The Legislature enacted section 12811 in 1959, requiring an "engraved picture or photograph of the licensee for the purpose of identification."[2] (§ 12811, subd. (a)(1)(A).) In December 1963, an adherent of the Molokan faith named John E. Shubin filed a petition for writ of mandate in the Los Angeles Superior Court, seeking an exemption from section 12811's photograph requirement based on the claim that it violated his federal and state free exercise rights. A superior court judge issued the writ on September 24, 1964, commanding the DMV to "act upon any pending or future application by petitioner, John E. Shubin, for a driver's license without requiring petitioner to have his photograph taken or placed upon his license."

Although the 1964 ruling applied only to Shubin, the DMV "made an administrative decision to extend the privilege to others with the same religious beliefs." Accordingly, it issued a series of driver's licenses without photographs to Valov. However, when Valov sought to renew his license in 2003, the DMV informed him that "in the interest of national security and to prevent identity theft, the [DMV] made a decision to abolish the [photograph] exemption." The DMV explained further that, despite its desire "to be sensitive to the needs of all applicants," it had found that the state's driver's

---

[2] Section 12800.5, providing that "[a] license shall bear a fullface engraved picture or photograph of the licensee," was enacted in 1965.

license, along with the section 13005 identification card,[3] have become "the most widely accepted identification document[s] in our state. This has resulted in a compelling need for a full face, unobstructed photograph of the licensee. Therefore, the absence of a photograph on the DL/ID card would undermine the state's ability to achieve public safety and protect its citizens' indentit[ies]."

The DMV opposed Valov's petition for writ of mandate, relying largely on the declaration of Joe M. Barnett, special advisor/consultant to the Director of the DMV. Barnett had served in that capacity since 1996, under the tenures of the four most recent directors. Prior to that, he gained extensive experience in law enforcement and motor vehicle related matters in his 31-year career with the California Highway Patrol (CHP), rising to Northern Division Commander and overseeing CHP operations in the 13 Northern California counties. In his unchallenged declaration, Barnett stated that a photographic image of a licensee's face was an essential part of the biometric data used to identify persons for law enforcement and public safety purposes. While thumbprints are the most reliable biometric identifier, law enforcement officers cannot use them in the field. "At the present time, the photograph is the most reliable, accurate, and timely means of identification" for officers in the field. As such, the driver's license photograph is "absolutely essential to law enforcement officers in the field because the longer it takes to verify a person's identity, the higher the risk of injury or harm to motorists and officers, especially in high traffic volume or high-speed locations. . . . [T]he longer it takes a CHP or local law enforcement officer to verify a person's identity during a traffic stop, the greater risk that another vehicle will drift or otherwise make contact with the officer or vehicles at the side of the road."

Barnett also stated that photographs of licensees are an integral part of California's statewide efforts to combat fraud and identity theft. To those ends, the DMV employees are now required to compare applicants for duplicate driver's licenses and identification cards with their photographs to prevent the issuance of fraudulent cards. This recent reform was intended not only to prevent identity theft, but also to combat terrorism and various types of fraud. The DMV has determined state businesses engaged in check cashing and vehicle rentals rely on the photographic images on state driver's licenses and identification cards as the primary form of identification to prevent fraud. Finally, federal authorities rely on those photographic images for airport security and the prevention of terrorism.

---

[3] "The identification card shall resemble in appearance, so far as is practicable, a driver's license issued pursuant to this code. It shall adequately describe the applicant, bear his or her picture, and be produced in color or engraved by a process or processes that prohibit, as near as possible, the ability to alter or reproduce the identification card, or prohibit the ability to superimpose a picture or photograph on the identification card without ready detection." (§ 13005, subd. (a).)

## DISCUSSION

In *Catholic Charities of Sacramento, Inc. v. Superior Court* (2004) 32 Cal.4th 527 [10 Cal.Rptr.3d 283, 85 P.3d 67] (*Catholic Charities*), our Supreme Court carefully addressed the current state of free exercise jurisprudence from the standpoints of both the federal and state Constitutions. The Supreme Court found that neither free exercise clause entitled a religiously-affiliated employer to an exemption from the general requirement under the Women's Contraception Equity Act (WCEA) that employers offering insurance coverage for prescription drugs must provide coverage for prescription contraceptives, even though the employer opposed the use of contraceptives on religious grounds. (32 Cal.4th at p. 537.) We address Valov's free exercise arguments in light of *Catholic Charities*.

■ "The interpretation of a statute and the determination of its constitutionality are questions of law. In such cases, appellate courts apply a de novo standard of review." (*People v. Health Laboratories of North America, Inc.* (2001) 87 Cal.App.4th 442, 445 [104 Cal.Rptr.2d 618]; *Berry v. City of Santa Barbara* (1995) 40 Cal.App.4th 1075, 1082 [47 Cal.Rptr.2d 661] ["In this First Amendment case, we review de novo, i.e., we independently decide, whether the ordinance violates the First and Fourteenth Amendments to the United States Constitution"].)

### 1. First Amendment Analysis

■ The First Amendment's religion clauses, made applicable to the states through the Fourteenth Amendment,[4] provide: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." (U.S. Const., 1st Amend.) "The free exercise clause guarantees the protection of two concepts: freedom to believe and freedom to act. [Citation.] The freedom to believe is absolute. However, religious conduct may be subject to regulation for the protection of society." (*McNair v. Worldwide Church of God* (1987) 197 Cal.App.3d 363, 374 [242 Cal.Rptr. 823], citing *Cantwell v. Connecticut, supra,* 310 U.S. at pp. 303–304.)

■ As our Supreme Court instructs, any First Amendment free exercise analysis must take into consideration the United States Supreme Court's decision in *Employment Div., Ore. Dept. of Human Res. v. Smith* (1990) 494 U.S. 872, 876–890 [108 L.Ed.2d 876, 110 S.Ct. 1595] (*Smith*). (*Catholic Charities, supra,* 32 Cal.4th at p. 547.) In *Smith,* the high court abandoned the "strict scrutiny" or compelling government purpose test for laws that substantially burdened the exercise of a person's religious belief: *Smith*

---

[4] *Cantwell v. Connecticut* (1940) 310 U.S. 296, 303–304 [84 L.Ed. 1213, 60 S.Ct. 900].

"articulated the general rule that religious beliefs do not excuse compliance with otherwise valid laws regulating matters the state is free to regulate. [Citation.] The government may not regulate religious beliefs as such by compelling or punishing their affirmation. [Citation.] Nor may it target conduct for regulation only because it is undertaken for religious reasons. [Citation.] But 'the right of free exercise does not relieve an individual of the obligation to comply with a "valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." ' [Citations.] To permit religious beliefs to excuse acts contrary to law, the *Smith* court reasoned, ' "would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself." ' [Citations.]" (*Catholic Charities, supra,* 32 Cal.4th at pp. 547–548.)

■ "More recently, the court has reaffirmed *Smith* and reiterated 'the general proposition that a law that is neutral and of general applicability need not be justified by a compelling government interest even if the law has the incidental effect of burdening a particular religious practice.' " (*Catholic Charities, supra,* 32 Cal.4th at p. 549, quoting *Church of Lukumi Babalu Aye, Inc. v. Hialeah* (1993) 508 U.S. 520, 531 [124 L.Ed.2d 472, 113 S.Ct. 2217] (*Lukumi*); see *Bowen v. Roy* (1986) 476 U.S. 693, 707–708 [90 L.Ed.2d 735, 106 S.Ct. 2147] ["[a]bsent proof of an intent to discriminate against particular religious beliefs or against religion in general, the Government meets its burden when it demonstrates that a challenged requirement for governmental benefits, neutral and uniform in its application, is a reasonable means of promoting a legitimate public interest"].) Strict scrutiny survives, however, as an exception to the general rule—that is, where the law is not neutral and generally applicable. "A law failing to satisfy these requirements must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." (*Lukumi, supra,* 508 U.S. at pp. 531–532; see *Catholic Charities, supra,* 32 Cal.4th at p. 549.)

■ Here, as the trial court found, the photograph requirement mandated by sections 12800.5, subdivision (a), and 12811 applies neutrally and generally to all persons seeking California driver's licenses. There can be no serious dispute that mandating the inclusion of a licensee's identifying photograph is a rational means of achieving the legitimate governmental purposes of promoting highway safety, discouraging fraud, and deterring identity theft. "In the absence of national legislation covering the subject[,] a [s]tate may rightfully prescribe uniform regulations necessary for public safety and order in respect to the operation upon its highways of all motor vehicles—those moving in interstate commerce as well as others. And to this end it may require the registration of such vehicles and the licensing of their drivers, charging therefor reasonable fees . . . . This is but an exercise of the police power uniformly recognized as belonging to the [s]tates and essential

to the preservation of the health, safety[,] and comfort of their citizens . . . ." (*Hendrick v. Maryland* (1915) 235 U.S. 610, 622 [59 L.Ed. 385, 35 S.Ct. 140]; see *Dorsey v. Barba* (1952) 38 Cal.2d 350, 354 [240 P.2d 604] ["The requirements for registration were enacted in the interests of public welfare, and one of the purposes for the legislation is to afford identification of vehicles and persons responsible in cases of accident and injury"], overruled on other grounds in *Jehl v. Southern Pac. Co.* (1967) 66 Cal.2d 821, 828 [59 Cal.Rptr. 276, 427 P.2d 988].)

As we held in analogous circumstances, "[t]he Vehicle Code section mandating the provision of an applicant's Social Security number meets the rational basis test: it is a religion-neutral law of general applicability. Thus, although it may incidentally burden petitioners' religious practices, it does not offend the First Amendment's free exercise clause so long as it is a rational means of achieving a legitimate governmental end." (*Brunson v. Department of Motor Vehicles* (1999) 72 Cal.App.4th 1251, 1255 [85 Cal. Rtpr. 2d 710] (*Brunson*);[5] see *Bowen v. Roy, supra,* 467 U.S. at pp. 700–708 [government's administrative interest in requiring all federal food stamp beneficiaries to provide Social Security numbers prevails against free exercise challenge based on Native American's sincerely held religious belief that the use of such a number would cause spiritual harm].)

Valov, however, argues that the Vehicle Code's driver's license photograph requirement should be assessed under the strict scrutiny standard because it is not neutral and generally applicable, but amounts to a "religious gerrymander." (See *Lukumi, supra,* 508 U.S. at pp. 533–547; *Catholic Charities, supra,* 32 Cal.4th at pp. 549–556.) Valov's efforts to obtain such strict scrutiny review are unavailing.

■ As the high court has explained, laws are not neutral and generally applicable when they target religious beliefs as such: "[I]f the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral." (*Lukumi, supra,* 508 U.S. at p. 533; see *Catholic Charities, supra,* 32 Cal.4th at p. 550.) To assess a law's neutrality, we first look to its text: "A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context." (*Ibid.*) Obviously, both section 12800.5, subdivision (a) and section 12811, subdivision (a)(1)(A) are facially neutral. They are phrased in secular terms to achieve the nonreligious purpose of identifying the licensee, by requiring that all driver's licenses bear the licensee's photograph—without any regard to the licensee's religious beliefs or practices.

---

[5] As we discuss in part 2, *post, Catholic Charities* criticized *Brunson*'s analysis of the free exercise provision of the California Constitution. (*Catholic Charities, supra,* 32 Cal.4th at p. 560.) That criticism did not affect *Brunson*'s First Amendment analysis.

■ However, facial neutrality is not enough. The First Amendment protects against governmental hostility to religious conduct whether it is overt or covert. (*Lukumi, supra,* 508 U.S. at p. 534.) Accordingly, we " 'must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders.' [Citation.]" (*Ibid.*) To do so, we assess whether the design of even facially neutral legislation amounts to "an impermissible attempt to target petitioners and their religious practices." (*Id.* at p. 535.) Thus, in *Lukumi,* the high court found that through "careful drafting," a set of ordinances dealing generally with ritual slaughter of animals ensured that only the practices of a single religious faith would be outlawed. (*Id.* at p. 536.) For instance, as drafted and interpreted, the ordinances not only provided an exemption for kosher slaughter, but excluded hunting, slaughter of animals for food, eradication of insects and pests, and animal euthanasia from the general proscription against killing animals. (*Id.* at pp. 535–537.) In effect, it was the religious motivation for specific conduct—killing animals— that was singled out for discriminatory treatment. (*Id.* at pp. 537–538.)

Nothing in this record supports the inference of a covert targeting of Valov's religious practices. Unlike the ordinances in *Lukumi,* the Vehicle Code provides no exemptions to the photograph requirement. Thus, Valov cannot show that persons advancing nonreligious reasons (or religious reasons different from Valov's) receive an exemption. Rather, the record shows that anyone who refuses to comply with the Vehicle Code's photograph requirements—for whatever reason—will be denied a driver's license.

Nevertheless, Valov asserts that the DMV's decision to enforce the photograph requirement by revoking the prior exemption amounts to a religious gerrymander because, in the past, only Molokans had requested and received accommodation for their religious scruples. According to Valov, "[o]ther religions do not hold graven images as being one of their core beliefs and, as such, have not requested accommodations." It follows, Valov contends, that the DMV's policy change was targeted solely at Molokans. This argument fails for a variety of reasons. First, the factual premise is pure speculation. At most, the record shows that the DMV provided similarly situated Molokans with an exemption following the Shubin ruling in 1964. The record shows that it was the DMV's policy to "extend the privilege to others with the same religious beliefs." Such a policy would encompass persons of other faiths who also possessed religious scruples against being photographed. Nothing in the record supports the assertion that similar requests for accommodation were never made by, nor provided to, non-Molokans.[6]

---

[6] In *Stackler v. Department of Motor Vehicles* (1980) 105 Cal.App.3d 240, 247 [164 Cal.Rptr. 203], the court affirmed an unsuccessful challenge to the DMV's denial of a

Moreover, a survey of authorities from other jurisdictions disproves Valov's assertion that only Molokans believe that the biblical injunction against graven images proscribes believers from being photographed. In *Johnson v. Motor Vehicle Division, Etc.* (1979) 197 Colo. 455 [593 P.2d 1363], appellants were members of a religious organization known as the Assembly of YHWHHOSHUA, who "believe[d] that the Bible directs that they not allow any photograph to be taken of them." Just like Valov, "[t]hey base their belief on a literal interpretation of the second commandment, as pronounced in Exodus 20:4 . . . ." (*Ibid.*; see *Dennis v. Charnes* (D.Colo. 1986) 646 F.Supp. 158, 159–160 [same]; *Quaring v. Peterson* (8th Cir. 1984) 728 F.2d 1121, 1123 (*Quaring*) [unaffiliated Christian refused to be photographed for a driver's license because "[s]he believes the Second Commandment forbids her from possessing any image have a likeness of anything in creation"], affd. by an equally divided Supreme Court in *Jensen v. Quaring* (1985) 472 U.S. 478 [86 L.Ed.2d 383, 105 S.Ct. 3492]; *Bureau of Motor Vehicles v. Pentecostal House of Prayer, Inc.* (Ind. 1978) 269 Ind. 361 [380 N.E.2d 1225, 1226] [same with regard to Amish and Pentecostal Christians]; *United States v. Slabaugh* (8th Cir. 1988) 852 F.2d 1081, 1082 [same with regard to member of the Amish faith]; *In re Miller* (N.Y. App. Div. 1998) 252 A.D.2d 156, 157 [684 N.Y.S.2d 368] [challenge to pistol permit's photograph requirement by member of Amish faith].) In addition, in at least one instance, a person relied on an entirely different religious basis to challenge a state's driver's license photograph requirement. (*Freeman v. Department of Highway Safety and Motor Vehicles* (Fla. Dist. Ct. App., Sept. 2, 2005, No. 5D03-2296)* 2005 WL 2108094 2 (*Freeman*) [Petitioner believed that Islam mandates that she wear a veil covering her face "in situations such as this, i.e., the taking of a photograph. She contend[ed] the Department was clearly making her choose between violating her religious tenets or sacrificing her driver's license."].)

Contrary to Valov's assertion, the fact that the DMV revoked its policy-based religious exemption is not persuasive evidence that it was targeting Molokans because of their beliefs. As shown, *ante*, there is no evidence that the exemption was revoked as to Valov and other Molokans, but retained so as to exempt persons other than Molokans who objected to being photographed. Further, not only did Valov fail to impeach the DMV's religion-neutral justifications for the policy change, but also the revocation simply served to ensure strict compliance with a facially neutral law. In sum, the

---

photograph exemption, where the petitioner challenged the photograph requirement on grounds *other* than the First Amendment right.

---

*Reporter's Note: Subsequent to the filing of this opinion, the *Freeman* opinion was withdrawn on a grant of rehearing by the Florida District Court of Appeal. See the substitued opinion, filed February 13, 2006, at 924 So.2d 48, 52.

mere fact that the DMV had previously attempted to accommodate persons of the Molokan faith does not mean the change was attributable to anti-Molokan hostility.

We find the analysis in *Knights of Columbus, Council # 94 v. Town of Lexington* (1st Cir. 2001) 272 F.3d 25 to be instructive. There, a town had historically allowed the petitioner to display a holiday créche on a public site, but enacted a regulation banning all unattended structures on that site "after requests for permits for alternative religious displays began to sprout." (*Id.* at p. 32.) As the federal appellate court explained, "[t]his is a far cry from an invidious singling-out of the creche." (*Ibid.*, fn. omitted.) To the contrary, "[t]he Town's longstanding practice of permitting the creche to be displayed on the Green without a permit helps, rather than hinders, the Town's argument. That practice shows a receptivity to the display and, contrary to the Knights' importunings, creates no entitlement to preferential treatment in the future." (*Id.* at p. 32, fn. 3.) "The only inference that the record permits is that the new regulation was conceived out of a desire to treat all religious expression even-handedly. If the Knights feel that the burden of the regulation falls most heavily on them, it is perhaps because they are now held to the same standard as all other similarly situated applicants. While the adjustment may not be an easy one, the outcome is inescapably content-neutral." (*Ibid.*) As our Supreme Court explained in an analogous context, a permissible attempt to accommodate religious objectors from a given statute does not become a religious gerrymander merely because it fails to accommodate all such objectors. (*Catholic Charities, supra,* 32 Cal.4th at p. 553.)

In sum, Valov's First Amendment claim fails because the Vehicle Code's photograph requirement is a neutral, generally applicable requirement that is rationally related to achieving the legitimate governmental interests of promoting highway safety, discouraging fraud, and deterring identity theft, while only incidentally burdening Valov's religious beliefs and practices.

### 2. State Constitutional Analysis

Article I, section 4 of the California Constitution provides: "Free exercise and enjoyment of religion without discrimination or preference are guaranteed. This liberty of conscience does not excuse acts that are licentious or inconsistent with the peace or safety of the State. The Legislature shall make no law respecting an establishment of religion." (Cal. Const., art. I, § 4.) In *Catholic Charities*, our Supreme Court found that this court's decision in *Brunson, supra,* 72 Cal.App.4th 1251 erred in concluding that *Smith v. Fair Employment & Housing Com.* (1996) 12 Cal.4th 1143 [51 Cal.Rptr.2d 700, 913 P.2d 909] mandated "application of the rational basis test to the petitioners' claims under the state free exercise clause." (*Catholic Charities, supra,* 32 Cal.4th at p. 560.) In fact, the *Smith* court had left open the question of whether California's free exercise clause required strict scrutiny or some

other level of review. (*Catholic Charities,* at pp. 559–562.) The *Catholic Charities* court, however, did not find it necessary "to declare the scope and proper interpretation of the California Constitution's free exercise clause" (*id.* at. p. 562), because the statute at issue survived strict scrutiny review: "Assuming for the sake of argument the WCEA substantially burdens a religious belief or practice, the law nevertheless serves a compelling state interest and is narrowly tailored to achieve that interest. [¶] The WCEA serves the compelling state interest of eliminating gender discrimination." (*Id.* at p. 564.)

 The same is true with regard to Valov's claim.[7] Under strict scrutiny, a law must not substantially burden a religious belief or practice unless it "represented the least restrictive means of achieving a compelling interest or, in other words, was narrowly tailored." (*Catholic Charities, supra,* 32 Cal.4th at p. 562, citing *Thomas v. Review Bd., Ind. Empl. Sec. Div.* (1981) 450 U.S. 707, 718 [67 L.Ed.2d 624, 101 S.Ct. 1425]; *Sherbert v. Verner* (1963) 374 U.S. 398, 403, 406–408 [10 L.Ed.2d 965, 83 S.Ct. 1790].) "[A] law substantially burdens a religious belief if it 'conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs . . . .' " (*Catholic Charities, supra,* 32 Cal.4th at p. 562, quoting *Thomas v. Review Bd., Ind. Empl. Sec. Div., supra,* 450 U.S. at pp. 717–718.)

We assume that the conflict between following the Molokan proscription against the use of photographs and the Vehicle Code's photograph requirement substantially burdened Valov's religious beliefs.[8] We find, however, that

---

[7] The trial court did not address Valov's state Constitution free exercise claim under the strict scrutiny standard. Rather, following *Brunson* the trial court applied the rational basis test only. It appears that the trial court and the parties were unaware of the *Catholic Charities* decision, which was issued approximately six weeks before the hearing. However, as our review is de novo, and as the parties below addressed the issue under both strict scrutiny and rational basis standards, we find it appropriate to resolve the issue in this appeal. (See, e.g., *J.B. Aguerre, Inc. v. American Guarantee & Liability Ins. Co.* (1997) 59 Cal.App.4th 6, 15–16 [68 Cal.Rptr.2d 837] ["A trial court's order is affirmed if correct on any theory, even if the trial court's reasoning was not correct"].)

[8] We note, however, that the courts of this state have made it clear that the fundamental right to travel does not include a right to use a particular mode of transportation, such as driving a motor vehicle. (E.g., *McGue v. Sillas* (1978) 82 Cal.App.3d 799, 805 [147 Cal.Rptr. 354].) In *Freeman,* the Florida appellate court determined that the state did not violate the appellant's religious exercise right under the Florida Religious Freedom Restoration Act of 1998, which imposed a version of the strict scrutiny standard, by requiring that a Moslem woman be photographed without her veil to obtain a driver's license, finding the requirement did not impose a substantial burden "because it does not compel Freeman to engage in conduct that her religion forbids—her religion does not forbid all photographs." (*Freeman, supra,* 2005 WL 2108094.[*])

---

[*]See Reporter's Note, *ante,* page 1124.

the requirement "nevertheless serves a compelling state interest and is narrowly tailored to achieve that interest." (*Catholic Charities, supra,* 32 Cal.4th at p. 564.)

■■■ The courts of this state have consistently recognized the need to afford our Legislature with broad scope to regulate the manner in which drivers conduct themselves on our public highways. Indeed, "the California Supreme Court has held that driving a motor vehicle on the public highways is a *privilege.* [Citation.]" (*Tolces v. Trask* (1999) 76 Cal.App.4th 285, 290 [90 Cal.Rptr.2d 294].) While that privilege " 'constitute[s] an important property right [citations], [it is] not so fundamental a right as to trigger a strict scrutiny analysis.' " (*Ibid.,* citing *King v. Meese* (1987) 43 Cal.3d 1217, 1228 [240 Cal.Rptr. 829, 743 P.2d 889]; *McGlothlen v. Department of Motor Vehicles* (1977) 71 Cal.App.3d 1005, 1021 [140 Cal.Rptr. 168].) As such, the privilege is " 'subject to reasonable regulation, under the police power, in the interest of the public safety and welfare . . . .' " (*Tolces v. Trask, supra,* 76 Cal.App.4th at p. 290.) " '[T]he area of driving is particularly appropriate for extensive legislative regulation, and . . . the state's traditionally broad police power authority . . . reasonably relates to public health or safety [and] operates with full force in this domain.' " (*Ibid.,* quoting *Hernandez v. Department of Motor Vehicles* (1981) 30 Cal.3d 70, 74 [177 Cal.Rptr. 566, 634 P.2d 917].)

Our Legislature has made similar findings. Section 14607.4 states that "[d]riving a motor vehicle on the public streets and highways is a privilege, not a right," and the state "has a critical interest in enforcing its traffic laws and in keeping unlicensed drivers from illegally driving." In 2003, section 12500, subdivision (a) required[9] that "[n]o person shall drive a motor vehicle upon a highway, unless the person then holds a valid driver's license issued under this code . . . ." "The requirements for registration were enacted in the interests of public welfare, and one of the purposes for the legislation is to afford identification of vehicles and persons responsible in cases of accident and injury." (*Dorsey v. Barba, supra,* 38 Cal.2d at p. 354, overruled on other grounds in *Jehl v. Southern Pac. Co., supra,* 66 Cal.2d at p. 828.)

These judicial and legislative findings strongly support the existence of a compelling state interest in requiring that all licensees provide a photograph as a condition of receiving a driver's license. Moreover, the DMV's evidence

---

[9] The Legislature's amendments to the statute in 2004 do not affect our findings. Section 12500, subdivision (a) now provides: "A person may not drive a motor vehicle upon a highway, unless the person then holds a valid driver's license issued under this code . . . ."

presented below, which was neither impeached nor rebutted, amply demonstrated that the photograph requirement serves a variety of compelling governmental purposes. It cannot be seriously doubted that there is a compelling interest in the expeditious identification of persons during traffic stops and at the scene of accidents. The unchallenged evidence showed that a driver's license photograph is the most reliable, accurate, and timely means of identifying persons while on the public roadways. As roadside delay increases, so does the danger to the safety of the motorists and officers involved.

Nor can it be seriously doubted that our state has a compelling interest in protecting its citizens against fraud and identity theft. (Cf. *Catholic Charities, supra*, 32 Cal.4th at p. 564 [recognizing compelling state interest in eliminating gender discrimination].) In *Johnson v. Motor Vehicle Division, Etc., supra*, 593 P.2d at page 1365, the Colorado Supreme Court, applying strict scrutiny in a pre-*Smith* decision, rejected a free exercise challenge materially indistinguishable from Valov's. The *Johnson* court found that "only a photograph can provide a police officer who makes a traffic stop with a ready and instantaneous means of determining that the person tendering the driver's license is indeed the person to whom the license was issued. [Citation.] The exigencies of law enforcement cannot brook the delay inherent in other means of identification." (*Johnson, supra,* at p. 1365; cf. *State v. Arnold* (S.D. 1986) 379 N.W.2d 322, 324 ["We find the state driving licensure requirement to achieve the compelling state interests of maintaining, protecting, and regulating the public safety, the use of its public thoroughfares, and those who drive thereon, and to be the least restrictive means for so doing. [Citation.] The driver's licensure requirement is not a limitation on Arnold's religious freedom."].)

Further, the DMV's unchallenged evidence showed state and local law enforcement agencies, along with California businesses, rely heavily on the photographs in state driver's licenses and identity cards to prevent fraud. More specifically, the California Department of Justice uses the DMV's photographs for a statewide database for law enforcement purposes. In that regard, we find persuasive a 1994 opinion by the Maryland Attorney General concerning whether the state was required to issue a "non-photo" driver's license to a religious objector. (79 Ops.Md.Atty.Gen. 45 [1994 WL 199658].) Applying strict scrutiny, the opinion found that the photograph requirement was narrowly drawn to achieve the compelling state purposes of protecting citizens against fraud and safeguarding public safety. "Maryland's interest in the photograph requirement goes to the core of government's role in protecting its citizens against victimization. The State's interest in preventing individuals from establishing a false identification by means of a driver's license is not simply a matter of administrative convenience. Since driver's licenses are used to establish identity for a host of commercial transactions,

the photograph requirement, intended to permit a merchant to establish that the license is really that of the individual proffering it, serves the compelling interest in protecting the public from fraud." (*Id.* 1994 WL 199658 at *4.)

Valov does not argue that these interests are not compelling in themselves, but contends they are either pretextual or admit of less restrictive alternatives. In essence, Valov argues that the same concerns existed long before the DMV revoked Valov's religious exemption. If such concerns are so pressing, he asserts, why only choose to act on them in 2003? We reject that argument as it is merely a reiteration of his unsupported assertion that the DMV's policy change was intended to target Molokans. Moreover, with regard to identity theft, the DMV presented unchallenged evidence that the incidence of such crimes has significantly increased in recent years. Of course, it is undeniable that public safety concerns—specifically, counterterrorism interests—changed drastically after September 11, 2001. Terrorist attacks subsequent to September 11, 2001, further testify to the need for such heightened public safety concerns. The issue is not, as Valov contends, whether he poses a threat to public safety. Rather, we find the DMV was justified in revoking a religious exemption that would provide a ready means for criminal offenders and potential terrorists to conceal their identities, obtain fraudulent driver's licenses, and frustrate airport security.

Nor did Valov undercut the DMV's showing that there was no readily available, less restrictive means of achieving these interests. While alternatives such as fingerprints would adequately serve to identify licensees, photographs are the only effective means that is readily available to officers in the field—or to citizens and businesses involved in commerce who seek to protect themselves against fraud and identity theft. (See 79 Ops.Md.Atty.Gen. 45 [1994 WL 199658 at *5] [explaining that identification alternatives such as physical descriptions of the licensee are "far less effective . . . than a photograph"].)

The Supreme Court of Minnesota's decision in *State v. Hershberger* (Minn. 1990) 462 N.W.2d 393 (*Hershberger II*) is illuminating. There, applying the Minnesota Constitution, the court found a violation of the Amish defendants' freedom of conscience rights where the state refused to grant an exemption to a statute requiring drivers of slow-moving vehicles to display a triangular, fluorescent orange-red sign when using the state highways. The defendants argued that the statute conflicted with the dictates of their religion because it required them to affix proscribed "worldly symbols" to their horse and buggy vehicles. Minnesota's freedom of conscience rights were part of the state Constitution's version of the First Amendment, which is similar to article I, section 4 of the California Constitution. The Minnesota Supreme Court

applied a strict scrutiny/compelling state interest balancing test, acknowledged that the "state's interest in public safety cannot be disputed," but found that the state failed to prove the absence of a less restrictive alternative. (462 N.W.2d at p. 399.) Specifically, the state failed to rebut the defendants' evidence that their proffered alternative—use of white or silver reflective tape and a lighted red lantern—was at least as effective as the statutorily-required reflective signs. (*Ibid.*; see *State v. Hershberger* (Minn. 1989) 444 N.W.2d 282, 289 (*Hershberger I*) ["testimony at the hearing established that the silver reflectorized tape was at least as bright, if not brighter than that outlining either triangular emblem mandated by the statute"], cert. granted and judg. vacated in *Minnesota v. Hershberger* (1990) 495 U.S. 901 [109 L.Ed.2d 282, 110 S.Ct. 1918].)[10]

The situation is reversed here: The DMV presented unchallenged evidence that the photograph requirement was narrowly tailored to achieve the state's interest in public safety. While we are aware of some pre-9/11 decisions in other jurisdictions that found free exercise violations based on religious objections to driver's license photographs, we find them unpersuasive. For instance, we respectfully disagree with the Indiana Supreme Court's finding in *Bureau of Motor Vehicles v. Pentecostal House of Prayer, Inc., supra,* 380 N.E.2d at page 1229, that there is a readily available, less restrictive alternative to photographic identifications—namely, "the statistics which are traditionally included on a driver's license, such as license number, height, weight, eye and hair color." Here, in contrast, the DMV's evidence compelled a contrary finding: "At the present time, the photograph is the most reliable, accurate, and timely means of identification" for officers in the field. (See also 79 Ops.Md.Atty.Gen. 45 [1994 WL 199658 at *5] [physical descriptions of the licensee are "far less effective . . . than a photograph"].)

In *Quaring, supra,* 728 F.2d 1121, the federal appellate court held that Nebraska driver's licensing law, requiring the photographs of applicants, violated the free exercise right of a petitioner, who—like Valov—maintained a literal interpretation of the biblical proscription against the making of graven images. (*Id.* at p. 1126.) The *Quaring* court found that the government's interest in providing police officers with an accurate and instantaneous means of identifying a motorist was not compelling, citing the fact that Nebraska exempted numerous motorists from having personal photographs on their licenses. (*Ibid.*) *Quaring* is distinguishable because it had no occasion to assess whether contemporary counterterrorism concerns justified the refusal to accommodate religious objections to identifying photographs. It is also

---

[10] The Supreme Court remanded *Hershberger I*, in light of *Smith*, and the Minnesota Supreme Court issued *Hershberger II*, on remand, based on the facts adduced in the prior opinion. (*Hershberger II, supra,* 462 N.W.2d at p. 396.)

distinguishable because Valov presented no evidence that the DMV provides a host of other exemptions to the photograph requirement. (*Id.* at p. 1127; see also *Dennis v. Charnes, supra,* 646 F.Supp. at p. 162 ["Ironically, it appears that the highest risk drivers, *i.e.*, suspected drunk drivers, probationary licensees, learners, youthful drivers, and those who have already established a pattern of law breaking by accumulating more than their maximum quota of points, are issued licenses without photographs"].)[11]

We also disagree with the Eighth Circuit's finding that there was no compelling interest in ensuring the security of financial transactions through the photograph requirement. The *Quaring* court dismissed that concern by pointing out that not all parties to such transactions have driver's licenses and, "[i]n any event, the state may still achieve its interest in ensuring the security of financial transactions because people may freely refuse to do business with Quaring if she is unable to present adequate identification." (*Quaring, supra,* 728 F.2d at p. 1127.) Suffice it to say, such an analysis ignores the reality that in states like California, where the driver's license is the most important identifying document, "a driver's license is the key that enables someone to obtain other documents under the same name." (79 Ops.Md.Atty.Gen. 45 [1994 WL 199658 at *4, fn. 7].) "[T]hus, a fraudulent driver's license is a passport to wider document fraud." (*Ibid.*)

■ In sum, even assuming our state's free exercise clause demands strict scrutiny of Valov's claim, the DMV presented unchallenged evidence that the photograph requirement was narrowly drawn to achieve the compelling and legitimate state purposes of ensuring public safety and discouraging identity theft and fraud.

### 3. *Other Constitutional Claims*

We reject Valov's attempt to refashion his free exercise claims into challenges to the photograph requirement under the First Amendment's establishment and free speech clauses. The invocation of those constitutional rights adds nothing material to his free exercise arguments. Valov's repeated assertions that the DMV is affirmatively compelling him to violate or deny his religious beliefs are mistaken. As the Supreme Court explained in the context of a challenge to the federal statutory requirement that applicants provide a Social Security number in order to receive government benefits, "[t]he administrative requirement does not create any danger of censorship or place a direct condition or burden on the dissemination of religious views. It

---

[11] Of course, the fact that *Quaring* was decided before *Smith* casts doubt on its precedential value, even within the Eighth Circuit.

does not intrude on the organization of a religious institution or school. It may indeed confront some applicants for benefits with choices, but in no sense does it affirmatively compel appellees, by threat of sanctions, to refrain from religiously motivated conduct or to engage in conduct that they find objectionable for religious reasons. Rather, it is appellees who seek benefits from the Government and who assert that, because of certain religious beliefs, they should be excused from compliance with a condition that is binding on all other persons who seek the same benefits from the Government." (*Bowen v. Roy, supra,* 476 U.S. at p. 703, fns. omitted.)

Because the same is true with regard to the Vehicle Code's photograph requirement and its application to Valov, we find his other constitutional claims to be meritless.

### 4. *Equitable Estoppel*

■ In his final contention, Valov asserts in perfunctory fashion, without adequate supporting legal authority, that the doctrine of equitable estoppel somehow operates to prevent the DMV from refusing to grant him a religious exemption to the Vehicle Code's photograph requirement. " '[E]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration. [Citations.]' [Citations.]" (*People v. Stanley* (1995) 10 Cal.4th 764, 793 [42 Cal.Rptr.2d 543, 897 P.2d 481].) Valov's mere offhand reference to the legal definition of "estoppel"—without any reference to the doctrine's legal elements,[12] much less any discussion of how the law applies to the facts in the record—falls short of the baseline standards for raising issues on appeal. (See, e.g., *People v. Barnett* (1998) 17 Cal.4th 1044, 1107, fn. 37 [74 Cal.Rptr.2d 121, 954 P.2d 384] ["As this contention is perfunctorily asserted without any analysis or argument in support, we reject is as not properly raised"]; *Dabney v. Dabney* (2002) 104 Cal.App.4th 379, 384 [127 Cal.Rptr.2d 917] ["We need not consider and argument for which no authority is furnished"]; *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784–785 [79 Cal.Rptr.2d 273] ["When an appellant . . . asserts [a point] but fails to support it with reasoned argument and citations authority, we treat the point as waived"].)

---

[12] "The required elements of an estoppel are: (1) the party to be estopped must be apprised of the facts; (2) the party to be estopped must intend his or her conduct shall be acted upon, or must so act that the party asserting the estoppel has a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) the other party must rely upon the conduct to his or her injury." (*Munoz v. State of California* (1995) 33 Cal.App.4th 1767, 1785 [39 Cal.Rptr.2d 860]; see *Wolitarsky v. Blue Cross of California* (1997) 53 Cal.App.4th 338, 345 [61 Cal.Rptr.2d 629].)

## DISPOSITION

The judgment is affirmed. The parties are to bear their own costs on appeal.

Turner, P. J., and Armstrong, J., concurred.

On October 7, 2005, the opinion was modified to read as printed above.